

## NUMBER 13-13-00529-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

THE STATE OF TEXAS,                                               **Appellant,**

**v.**

EMERITUS CORPORATION,                                    **Appellee.**

### On appeal from the 357th District Court
### of Cameron County, Texas.

## OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Longoria
Opinion by Chief Justice Valdez**

Emeritus Corporation ("Emeritus") operates an assisted living facility called Canterbury Court in Cameron County, Texas. In August 2012, a resident of Canterbury Court, suffering from dementia with a "history of exit[-]seeking behaviors," was left unsupervised and left the facility through its activity-room courtyard. The resident was

found dead shortly thereafter. After an investigation, the State of Texas, acting by and through the Office of the Attorney General ("OAG"), filed suit against Emeritus seeking statutory civil penalties, injunctive relief, and attorney's fees under the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA") and the Assisted Living Facility Licensing Act ("ALFLA"). *See* TEX. BUS. & COM. CODE ANN. § 17.47(a) (West, Westlaw through 2013 3d C.S.); TEX. HEALTH & SAFETY CODE ANN. § 247.045(d) (West, Westlaw through 2013 3d C.S.).

Emeritus moved to dismiss the case on grounds that it constituted a health care liability claim under the Texas Medical Liability Act (TMLA) and the State had failed to file an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b) (West, Westlaw through 2013 3d C.S.). The trial court agreed and granted Emeritus's motion to dismiss, dismissed the State's claims with prejudice, and awarded attorney's fees and costs to Emeritus. The State appealed. We conclude that the State, acting in its sovereign capacity on behalf of the public interest, seeking the imposition of statutory civil penalties and injunctive relief, does not constitute a claimant seeking damages under the TMLA. Accordingly, we reverse and remand.

## I. BACKGROUND

The State of Texas, acting by and through the OAG, "acting within the scope of his official duties under the Constitution and the laws of the State of Texas," and "at the request of the Commission of the Texas Department of Aging and Disability Services" ("DADS"), filed a petition against Emeritus under the DTPA and ALFLA seeking civil penalties, attorney's fees, and injunctive relief on grounds that Emeritus violated the minimum standards applicable to assisted living facilities in Texas, thereby threatening

2

the health and safety of its residents, and Emeritus misrepresented the services being offered at Canterbury Court. The State further asserted that:

> The State has reason to believe that Defendant is engaging in, has engaged in, or is about to engage in, the unlawful acts or practices set forth below, that Defendant has, by means of these unlawful acts and practices, caused damage to or acquired money or property from persons, and that Defendant adversely affects the lawful conduct of trade and commerce, thereby directly or indirectly affecting the people of this State. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas has determined that these proceedings are in the public interest.

The State's petition alleged that DADS had investigated an incident at Canterbury Court regarding "a resident who was found dead in a nearby field three days after he eloped from the facility." According to the DADS report, on August 17, 2012, Emeritus had conducted a preadmission assessment of the resident stating that the resident had a "history of exit seeking behaviors." On August 20, 2012, Emeritus admitted the resident to the Memory Care unit, a locked unit at Canterbury Court, with diagnoses of dementia and hypertension. On August 21, 2012, an Emeritus staff member accompanied the resident to a doctor's appointment where the resident attempted to leave without the staff member, thereby causing Emeritus to place the resident on an "alert charting" status to document his behavior every shift, and Emeritus instructed the staff that a staff member should monitor the patient "at all times." Nevertheless, on August 23, 2012, the resident was left unsupervised and eloped from the Memory Care unit through its activity room courtyard. The resident broke the boards from the fence enclosing the air conditioning unit, climbed on the air conditioning unit, and climbed a second fence to gain access to the public parking lot. Emeritus staff did not observe the resident's activities or departure. The DADS report also stated that on the day that the resident eloped, the alarm to the activity patio door was not activated, the bell to that door had been broken for at least one

3

year, and the door was not functional insofar as it locked people outside, preventing them from entering the facility.

The State's petition further alleged that Emeritus's acts and omissions failed to comply with representations made on its website that its facilities provided trained staff and monitoring twenty-four hours each day and helped residents maintain their dignity while aging, and advertised "specialized units for residents with Alzheimer's or dementia." The State also asserted that Emeritus failed to implement its own policies and procedures and misrepresented its services insofar as its policies and procedures protected residents from neglect.

The State sought a temporary and permanent injunction requiring Emeritus to: (1) keep its facilities' alarms, doorbells, and chimes activated; inspect or test the alarms, doorbells, and chimes at least once a month to assure adequate performance; replace malfunctioning alarms, doorbells, and chimes within twenty four hours; and keep records regarding such replacement; (2) require its employees to take a training course at least once a year regarding State laws, including but not limited to ALFLA, and policies and procedures relating to the duty to protect and safeguard residents' rights to be free from abuse, neglect, and exploitation, and require the employees to provide a signed acknowledgment that they had completed the training; (3) ensure that residents are able to enter and re-enter the facility without hindrance; (4) post signs informing employees that they are prohibited from violating residents' rights to be free from abuse, neglect, and exploitation, including but not limited to disabling alarms, door bells, and chimes; and (5) represent that the trial court, the OAG, or DADS has approved any good or service sold or offered for sale by Emeritus, or has approved any of its business practices.

The State sought "civil penalties" against Emeritus including "not less than $100.00 nor more than $10,000.00 for each day" an ALFLA violation occurred, an amount "not to exceed more than $20,000.00 per violation of the DTPA," and an additional amount of not more than $250,000.00 if the false, misleading, or deceptive acts or practice alleged was calculated to acquire or deprive money or other property from a consumer who was 65 years or older when the acts or practice occurred. The State also sought attorney's fees, investigation costs, and prejudgment and post judgment interest. *See* TEX. GOV'T CODE ANN. § 402.006(c) (West, Westlaw through 2013 3d C.S.) ("In a case in which the state is entitled to recover a penalty or damages the attorney general is entitled, on behalf of the state, to reasonable attorney's fees and court costs."). The State requested that the trial court rule that the fines, penalties, or forfeitures payable to it were not dischargeable under bankruptcy.

Emeritus answered the State's lawsuit and asserted the affirmative defense that each of the State's claims constitutes a "health care liability claim" under the TMLA. Emeritus subsequently moved to dismiss the lawsuit pursuant to Texas Civil Practice and Remedies Code section 74.351 because the State failed to file an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). On August 23, 2013, the trial court held a hearing on the motion to dismiss, at which time Emeritus put on evidence regarding attorney's fees.

On September 10, 2013, the trial court issued an order dismissing the State's claims with prejudice pursuant to section 74.351(b). The trial court also awarded Emeritus $55,000 in attorney's fees for the trial proceedings, $5,000 for appellate

proceedings in this Court, and an additional $5,000 for appellate proceedings in the Texas Supreme Court.

This appeal ensued. By two issues, the State contends: (1) the State is not subject to the expert report requirement in the TMLA when it, pursuant to its police power, seeks only statutory civil penalties and injunctive relief for violations of the DTPA and ALFLA; and (2) Emeritus is not entitled to attorney's fees and costs under section 74.351(b) of the civil practice and remedies code. Emeritus contends, in contrast, that the State is a claimant seeking the recovery of damages in a health care liability claim, and is thus subject to the TMLA expert report requirement.

## II. STATUTORY SCHEMES

This case involves three separate statutory schemes: the DTPA, the ALFLA, and the TMLA. We briefly examine each in the context of the pleadings filed in this case.

## A. DTPA

The DTPA's underlying purposes "are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." TEX. CIV. PRAC. & REM. CODE ANN. § 17.44 (a) (West, Westlaw through 2013 3d C.S.); *see PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004). While one of the DTPA's primary purposes was to encourage consumers themselves to file complaints, the statute also allows the attorney general to bring consumer protection actions. *PPG Indus., Inc.*, 146 S.W.3d at 84. Section 17.46(a) of the DTPA provides, in relevant part, as follows:

> False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the

6

consumer protection division [of the Attorney General's office] under section 17.47, 17.58, 17.60, and 17.61 of this code.

TEX. BUS. & COM. CODE ANN. § 17.46(a) (West, Westlaw through 2013 3d C.S.); *see Molano v. State*, 262 S.W.3d 554, 559 (Tex. App.—Corpus Christi 2008, no pet.). Under section 17.47 of the DTPA, "the attorney general may bring an action in the public interest against an entity it believes is engaged in conduct prohibited by the DTPA." *Bara v. Major Funding Corp. Liquidating Trust*, 876 S.W.2d 469, 471 (Tex. App.—Austin 1994, writ denied). Section 17.47 addresses actions brought by the attorney general:

(a)     Whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

Nothing herein shall require the consumer protection division to notify such person that court action is or may be under consideration. Provided, however, the consumer protection division shall, at least seven days prior to instituting such court action, contact such person to inform him in general of the alleged unlawful conduct. Cessation of unlawful conduct after such prior contact shall not render such court action moot under any circumstances, and such injunctive relief shall lie even if such person has ceased such unlawful conduct after such prior contact. Such prior contact shall not be required if, in the opinion of the consumer protection division, there is good cause to believe that such person would evade service of process if prior contact were made or that such person would destroy relevant records if prior contact were made, or that such an emergency exists that immediate and irreparable injury, loss, or damage would occur as a result of such delay in obtaining a temporary restraining order.

(b)     An action brought under Subsection (a) of this section which alleges a claim to relief under this section may be commenced in the district court of the county in which the person against whom it is brought resides, has his principal place of business, has done business, or in the district court of the county where the transaction occurred, or, on the consent of the parties, in a district court of Travis County. The court may issue temporary restraining orders, temporary or

7

permanent injunctions to restrain and prevent violations of this subchapter and such injunctive relief shall be issued without bond.

(c)     In addition to the request for a temporary restraining order, or permanent injunction in a proceeding brought under Subsection (a) of this section, the consumer protection division may request, and the trier of fact may award, a civil penalty to be paid to the state in an amount of:

(1)     not more than $20,000 per violation; and

(2)     if the act or practice that is the subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, an additional amount of not more than $250,000.

(d)     The court may make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice.  Damages may not include any damages incurred beyond a point two years prior to the institution of the action by the consumer protection division.  Orders of the court may also include the appointment of a receiver or a sequestration of assets if a person who has been ordered by a court to make restitution under this section has failed to do so within three months after the order to make restitution has become final and nonappealable.

(e)     Any person who violates the terms of an injunction under this section shall forfeit and pay to the state a civil penalty of not more than $10,000 per violation, not to exceed $50,000.  In determining whether or not an injunction has been violated the court shall take into consideration the maintenance of procedures reasonably adapted to insure compliance with the injunction.  For the purposes of this section, the district court issuing the injunction shall retain jurisdiction, and the cause shall be continued, and in these cases, the consumer protection division, or the district or county attorney with prior notice to the consumer protection division, acting in the name of the state, may petition for recovery of civil penalties under this section.

(f)     An order of the court awarding civil penalties under Subsection (e) of this section applies only to violations of the injunction incurred prior to the awarding of the penalty order.  Second or subsequent

violations of an injunction issued under this section are subject to the same penalties set out in Subsection (e) of this section.

(g)    In determining the amount of penalty imposed under Subsection (c), the trier of fact shall consider:

    (1)    the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice;

    (2)    the history of previous violations;

    (3)    the amount necessary to deter future violations;

    (4)    the economic effect on the person against whom the penalty is to be assessed;

    (5)    knowledge of the illegality of the act or practice; and

    (6)    any other matter that justice may require.

(h)    In bringing or participating in an action under this subchapter, the consumer protection division acts in the name of the state and does not establish an attorney-client relationship with another person, including a person to whom the consumer protection division requests that the court award relief.

TEX. BUS. & COM. CODE ANN. § 17.47.

## B. ALFLA

The ALFLA is codified in the health and safety code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 247.001–.098 (West, Westlaw through 2013 3d C.S.). The ALFLA was enacted to "ensure that assisted living facilities in this state deliver the highest possible quality of care." *Id.* § 247.0011(a). The ALFLA and rules adopted thereunder establish "minimum acceptable" levels of care, and violations of the minimum standards of care constitute violations of law. *See id.* Under the ALFLA, DADS is directed to protect the residents of assisted living facilities by, inter alia, adopting rules relating to the quality of care and quality of life, monitoring factors relating to the health, safety, welfare, and dignity

9

of residents, and imposing prompt and effective remedies for violations of the chapter and the rules and standards adopted thereunder. *Id.* § 247.0011(b); § 247.002(4) (defining the department).

Section 247.045 provides, in relevant part, that the OAG may enforce the ALFLA by seeking civil penalties:

(a)    Except as provided by Subsections (b) and (c), a person who violates this chapter or who fails to comply with a rule adopted under this chapter and whose violation is determined by the department to threaten the health and safety of a resident of an assisted living facility is subject to a civil penalty of not less than $100 nor more than $10,000 for each act of violation. Each day of a continuing violation constitutes a separate ground of recovery.

(b)    A person is subject to a civil penalty if the person:

(1)    is in violation of Section 247.021; or

(2)    has been determined to be in violation of Section 247.021 and violates any other provision of this chapter or fails to comply with a rule adopted under this chapter.

(c)    The amount of a civil penalty under Subsection (b) may not be less than $1,000 or more than $10,000 for each act of violation. Each day of a continuing violation constitutes a separate ground of recovery.

(d)    The attorney general may institute and conduct a suit to collect a penalty and fees under this section at the request of the department. If the attorney general fails to notify the department within 30 days of referral from the department that the attorney general will accept the case, the department shall refer the case to the local district attorney, county attorney, or city attorney. The district attorney, county attorney, or city attorney shall file suit in a district court to collect and retain the penalty.

(e)    Investigation and attorney's fees may not be assessed or collected by or on behalf of the department or other state agency unless a penalty described under this chapter is assessed.

(f)     The department and attorney general, or other legal representative as described in Subsection (d), shall work in close cooperation throughout any legal proceedings requested by the department.

(g)     The commissioner of human services must approve any settlement agreement to a suit brought under this chapter.

(h)     If a person who is liable under this section fails to pay any amount the person is obligated to pay under this section, the state may seek satisfaction from any owner, other controlling person, or affiliate of the person found liable. The owner, other controlling person, or affiliate may be found liable in the same suit or in another suit on a showing by the state that the amount to be paid has not been paid or otherwise legally discharged. The department by rule may establish a method for satisfying an obligation imposed under this section from an insurance policy, letter of credit, or other contingency fund.

*Id.* § 247.045. The OAG is also authorized to seek temporary restraining orders and injunctive relief to restrain continuing violations of the ALFLA where the violation creates an "immediate threat" to the health and safety of the assisted living facility residents, or the facility is operating without a license. *See id.* § 247.044.

## C. TMLA

Among the legislature's stated purposes in enacting the TMLA were reducing the excessive frequency and severity of HCLCs and decreasing the cost of those claims, while doing so in a manner that would not unduly restrict a claimant's rights. *See CHCA Woman's Hosp., L.P. v. Lidji*, 403 S.W.3d 228, 232 (Tex. 2013). The Texas Supreme Court has explained that the "fundamental goal" of the TMLA is "to make health care in Texas more available and less expensive by reducing the cost of health care liability claims." *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011).

To further these goals, a health care liability claimant must serve an expert report on each defendant no later than the 120th day after the defendant's answer is filed. *See*

11

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). The report must contain "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). To comply with the statutory requirements, the report need only provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). If an expert report has not been timely served, the court, on the motion of the affected health care provider, shall enter an order that dismisses the claim with respect to the health care provider with prejudice and awards reasonable attorney's fees and costs of court. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). Thus, the TMLA "entitles a defendant to dismissal of a health care liability claim if, within 120 days of the date suit was filed, he is not served with an expert report showing that the claim against him has merit." *Scoresby*, 346 S.W.3d at 549.

### III. STANDARD OF REVIEW

Generally, an appellate court reviews a ruling on a motion to dismiss under Chapter 74 for an abuse of discretion. *Jelinek v. Casas*, 328 S.W.3d 526, 538–39 (Tex. 2010); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc.*, 46 S.W.3d at 877–78. However, when the resolution of an issue on appeal requires the interpretation of a statute, an appellate court applies a de novo standard of review. *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012); *Tex. W. Oaks*

12

*Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012); *Tex. Laurel Ridge Hosp., L.P. v. Almazan*, 374 S.W.3d 601, 604 (Tex. App.—San Antonio 2012, no pet.). Thus, in determining whether the State's claims constitute health care liability claims that are subject to Chapter 74, we apply a de novo standard of review. *Tex. W. Oaks*, 371 S.W.3d at 17; *see Loaisiga*, 379 S.W.3d at 254–55.

## IV. ANALYSIS

By its first issue, the State asserts that it is not subject to the TMLA's expert report requirement when it is acting pursuant to its police power and seeking only statutory civil penalties and injunctive relief. More specifically, the State asserts that this lawsuit is not subject to the expert report requirements of the TMLA because it is not asserting a health care liability claim and it is not a claimant subject to the report requirement. Emeritus asserts otherwise. The State and Emeritus dispute virtually all potentially relevant issues in this appeal, including whether the State is a claimant or a person subject to the TMLA, whether the State's claims are health care liability claims, and whether the State is seeking damages under the TMLA. The parties invoke innumerable policy arguments regarding the disparate effects of a decision in this case.

In analyzing the issues herein, "[o]ur task is to effectuate the Legislature's expressed intent." *In re Allen*, 366 S.W.3d 696, 703 (Tex. 2012) (orig. proceeding); *see Ritchie v. Rupe*, 443 S.W.3d 856, 866 (Tex. 2014); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). In so doing, we do not impose our personal policy choices, second-guess the policy choices that inform our statutes, or weigh the effectiveness of their results. *Richie*, 443 S.W.3d at 866; *Iliff v. Iliff*, 339 S.W.3d 74, 79 (Tex. 2011); *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003). We focus on the

13

words of the statute, because "[l]egislative intent is best revealed in legislative language." *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) (orig. proceeding). We must enforce the statute "as written" and "refrain from rewriting text that lawmakers chose." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009); *see Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014).

Where the statutory text is clear, an appellate court presumes the words chosen are "'the surest guide to legislative intent.'" *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (quoting *Entergy Gulf States*, 282 S.W.3d at 437). In doing so, we first look to the definitions prescribed by the legislature and any technical or particular meaning the words have acquired. *See* TEX. GOV'T CODE ANN. § 311.011(b) (West, Westlaw through 2013 3d C.S.).

Only after considering the legislature's definitions does an appellate court look to the words' "plain and common meaning[s], unless [the legislature's] contrary intention is apparent from the context, or unless such a construction leads to absurd results." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008) (citations omitted). Thus, in the absence of statutory definitions, the "ordinary meaning of the statutory text is the first dip of the oar as courts embark on interpretation of a statute." *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014) (orig. proceeding). We limit our analysis to the words of the statute and apply the plain meaning of those words "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011); *see Jaster*, 438 S.W.3d at 562. We presume that a definition of a common word accords with and does not conflict with the ordinary meaning unless the language clearly indicates otherwise. *In re Ford Motor*

*Co.*, 442 S.W.3d at 271.  To determine a word's common, ordinary meaning, we look to a wide variety of sources, including dictionary definitions, treatises and commentaries, the appellate courts' prior constructions of the word in other contexts, the use and definitions of the word in other statutes and ordinances, and the use of the words in the rules of evidence and procedure.  *See Jaster*, 438 S.W.3d at 563.

Further, we consider words in light of the "lexical environment" in which we find them."  *Id.*  While we must consider the specific statutory language at issue, we must do so while looking to the statute as a whole, rather than as "isolated provisions."  *Id.*; *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).  We "endeavor to read the statute contextually, giving effect to every word, clause, and sentence."  *In re Office of Att'y Gen.*, 422 S.W.3d at 629.

We begin our analysis with the statute's words and then consider the apparent meaning of those words within their context.  *See Jaster*, 438 S.W.3d at 562.  In this case, we look to the statutory requirements of the TMLA.  Chapter 74 of the TMLA defines a "health care liability claim" as:

> A cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13).  Under the TMLA, a health care liability claim must satisfy three elements:  (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the

15

defendant's act or omission complained of must proximately cause the injury to the claimant. *Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014); *Tex. W. Oaks*, 371 S.W.3d at 179–80 (citing TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)). No one element, occurring independent of the other two, will recast a claim into a health care liability claim. *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 758 (Tex. 2014).

In order to determine whether a claim is a health care liability claim, we consider the underlying nature of the claim. *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 394 (Tex. 2011); *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010). Artful pleading cannot alter that nature. *Omaha Healthcare Ctr., LLC*, 344 S.W.3d at 394; *Yamada*, 335 S.W.3d at 196. We consider the record as a whole, the pleadings, and the factual allegations contained therein. *Loaisiga*, 379 S.W.3d at 259. When the underlying facts are encompassed by provisions of the TMLA, then all claims based on those facts must be brought as health care liability claims. *Yamada*, 335 S.W.3d at 193–94; *see PM Mgmt.–Trinity NC, LLC v. Kumets*, 404 S.W.3d 550, 552 (Tex. 2013). Claims "which require[ ] the use of expert health care testimony to support or refute the allegations" are health care liability claims. *Psychiatric Solutions, Inc. v. Palit*, 414 S.W.3d 724, 727 (Tex. 2013); *see Tex. W. Oaks*, 371 S.W.3d at 182. However, "[e]ven when expert medical testimony is not necessary," the claim may still be a health care liability claim. *Tex. W. Oaks*, 371 S.W.3d at 182 (citing *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005)). The broad language of the TMLA evidences legislative intent for the statute to have expansive application. *Loaisiga*, 379 S.W.3d at 256; *see also Rio Grande Valley Vein Clinic, P.A.*, 431 S.W.3d at 65. According to the Texas Supreme Court, the "breadth of

16

the statute's text" essentially creates a rebuttable presumption that a claim is a health care liability claim if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement. *Loaisiga*, 379 S.W.3d at 252.

Our analysis of the claims made in this case focuses on the definition of a "claimant" under the TMLA. A "claimant" under the TMLA is defined as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim." *See* TEX. CIV. PRAC. & REM. CODE Ann. § 74.001(a)(2).[1] All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant. *Id.* A "claimant" under the statute does not need to be the patient of a health care provider or physician for the claim to be considered a health care liability claim. *See Psychiatric Solutions, Inc.*, 414 S.W.3d at 725; *see also Tex. W. Oaks*, 371 S.W.3d at 179–80 (holding that the change from "patient" to "claimant" in the 2003 amendments to the TMLA includes an employee of a health care provider who brings a health care liability claim).

The State contends that it is not seeking damages as required by the statutory definition of a claimant, but is instead only seeking statutory civil penalties and injunctive relief. In contrast, Emeritus contends that the TMLA's definition of a claimant utilizes the broad term "damages," which includes civil penalties, and the TMLA does not require that

---

[1] Under the Texas Code Construction Act, a "person" includes a "corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity." *See* TEX. GOV'T CODE ANN. § 311.005(2) (West, Westlaw through 2013 3d C.S.). This definition applies unless the statute or context in which the word or phrase is used requires a different definition. *See id.* § 311.005.

17

the damages sought must be compensatory in nature.[2] Citing *United States v. Ursery*, 518 U.S. 27, 283–84 (1996) and *Ex Parte Baucom*, 928, S.W.2d 748 (Tex. App.—Beaumont 1996, pet. ref'd), Emeritus states that civil penalties are a "rough form of liquidated damages" for the public harms caused by illegal conduct. Emeritus also contends that civil penalties are designed at least in part "to compensate the government." *Ursery*, 518 U.S. at 284. Emeritus thus argues that civil penalties act as compensatory damages under the TMLA.

The general term "damages" is not defined in the TMLA.[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a). The TMLA states that any legal term or word of art used in it, but not otherwise defined, "shall have such meaning as is consistent with the common law." *Id.* § 74.001(b). According to Black's Law Dictionary, the term "damages" means money claimed by, or ordered to be paid to, a person as compensation for loss or injury. BLACK'S LAW DICTIONARY 355 (9th Ed. 2010). In contrast, a "penalty" is a punishment imposed on a wrongdoer, usually in the form of imprisonment or a fine, and a "civil penalty" is a fine assessed for a violation of a statue or regulation. *Id.* at 981.

---

[2] Emeritus contends that this Court's decision in *Holzman v. State*, No. 13-11-00168-CV, 2013 WL 398935, at **2–3 (Tex. App.—Corpus Christi Jan. 31, 2013, pet. denied) (mem. op.), "indicates that the State's decision to seek civil penalties, rather than damages, does not . . . prevent the TMLA from applying to the State." We disagree. In *Holzman*, this Court did not address the issue of whether damages under the TMLA include civil penalties. Rather, the Court concluded that the State had not raised a health care liability claim because it had not alleged bodily injury or death. *See id.* at *2. The fact that we did not address an issue in that case, where it was not fully briefed and where it was unnecessary to the resolution of the appeal, does not constitute an implied ruling on the merits of that issue.

[3] The TMLA defines "economic damages" and "noneconomic damages" by reference to the meanings assigned by section 41.001 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §74.001 (West, Westlaw through 2013 3d C.S.). Under section 41.001(4) of the civil practice and remedies code, "economic damages" are "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages." *Id.* § 41.001(4) (West, Westlaw through 2013 3d C.S.). Under section 41.001(12), "noneconomic damages" are "damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages." *Id.* §41.004(12).

The United States Supreme Court and various federal courts have rejected the proposition that damages, which are compensatory in nature and payable to a private litigant, are congruent with civil penalties, which are punitive in nature and payable to a governmental entity. *See Gabelli v. SEC*, 568 U.S. __, __, 81 USLW 4142, at *1223 (2013); *Tull v. United States*, 481 U.S. 412, 422 (1987); *S.E.C. v. City of Miami*, 581 Fed. Appx. 757, 760 (11th Cir. 2014); *Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001). "In a civil penalty action, the Government is not only a different kind of plaintiff, it seeks a different kind of relief," namely "penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers. *Gabelli*, 81 USLW 4142, at *1223. Penalties are "intended to punish culpable individuals," not "to extract compensation or restore the status quo." *Tull*, 481 U.S.at 422. Civil monetary penalties payable to the government do not constitute compensation for actual pecuniary loss. *Ellett Bros., Inc.*, 275 F.3d at 388 (noting that "civil penalties . . . are not 'damages' payable to the victim, but fines or assessments payable to the government").

The Texas Supreme Court has not expressly addressed whether damages under the TMLA include civil penalties so as to subject governmental entities seeking civil penalties to the same requirements as private claimants seeking damages.[4] However,

---

[4] Last month, the Fifth Circuit Court of Appeals certified questions to the Texas Supreme Court regarding whether civil penalties constitute damages under the Texas Optometry Act ("TOA"). *See Forte v. Wal-Mart Stores, Inc.*, No. 12-40854, 2015 WL 735782, at *9–10 (5th Cir. Feb. 20, 2015), *certified question accepted* (Mar. 6, 2015). In *Forte*, four optometrists who leased office space from Wal-Mart brought suit against Wal-Mart under the TOA alleging that a provision in their leases, which required them to remain open a certain number of hours each week, violated the TOA by controlling their office hours as optometrists. *Id.* Under the TOA, a person injured as a result of a violation, is entitled to seek, inter alia, injunctive relief or damages, "a civil penalty" not to exceed $1,000 for each day of a violation, court costs, and reasonable attorney's fees. *See* TEX. OCC. CODE ANN. §§ 351.602–.605 (West, Westlaw through 2013 3d C.S.). Following trial, the jury awarded the optometrists $3,953,000 in civil penalties. *Forte*, 2015 WL 735782, at *6. The trial court ordered a remittitur reducing the civil penalties to $400 per day, or $1,396,400. *Id.* On appeal, Wal–Mart argued: (a) the plaintiffs' action for civil penalties under the TOA was a damages action for purposes of Chapter 41; and (b) the plaintiffs' recovery is barred because they received an award of civil penalties, which is a form of exemplary damages, without recovering actual damages. *Id.* The Fifth

19

the foregoing definitions and authorities comport with analysis from the Texas Supreme Court regarding whether statutes which provide for penalties, rather than compensation, allow private causes of action for statutory violations. *Brown v. De La Cruz*, 156 S.W.3d 560, 563–64 (Tex. 2004). In *Brown*, the supreme court held that a former version of the property code that subjected a seller of residential property to a penalty for each day that the vendor failed to transfer title after the purchaser's final payment did not provide the purchaser with a private cause of action. *Id.* at 561. In so holding, the court reasoned that statutory fines or penalties are generally not payable to a private litigant. *Id.* The court further contrasted statutes which authorize actions for "damages" to private litigants, but authorize a "civil penalty" collectible by private prosecutors. *Id.*

Based on the ordinary meaning of "damages" and "civil penalties" as demonstrated by reference to standard legal definitions, other appellate court definitions, and the use of the words in other statutory contexts, *see In re Ford Motor Co.*, 442 S.W.3d at 271; *Jaster*, 438 S.W.3d at 563, we conclude that the term "damages" in the TMLA does not include civil penalties sought by the State rather than a private litigant. *See Gabelli*, 81 USLW 4142, at *1223; *Tull*, 481 U.S. at 422; *S.E.C.*, 581 Fed. Appx. at 760; *Ellett Bros., Inc.*, 275 F.3d at 388. Thus, the State, acting in its sovereign capacity seeking civil penalties, rather than damages, is not a claimant subject to the expert report requirement under the TMLA, and the TMLA does not apply to the case. We note that our decision here is limited

Circuit certified the following "determinative" questions of Texas law to the Supreme Court of Texas: (1) whether an action for a "civil penalty" under the TOA is an "action in which a claimant seeks damages relating to a cause of action" within the meaning of Chapter 41 of the Texas Civil Practice and Remedies Code; in other words, are civil penalties awarded under the TOA classified as "damages" as that term is used in Chapter 41; and (2) if civil penalties awarded under the TOA are "damages" as that term is used in Chapter 41, whether they are "exemplary damages" such that Chapter 41 precludes their recovery in any case where a plaintiff does not receive damages other than nominal damages. *Id.* at *10.

20

to the facts of this case, where the State has not sought "such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice." TEX. BUS. & COM. CODE ANN. § 17.47(d),(h); *see Avila v. State*, 252 S.W.3d 632, 647 (Tex. App.—Tyler 2008, no pet.) (contrasting cases where the state asserts claims on behalf of the state as opposed to claims asserted by individual consumers).

Our conclusion is buttressed by considering the purposes, policies, procedural requirements, and remedies of the TMLA, the DTPA, and the ALFLA to determine the correct application of the statutes. *See, e.g., Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 441 (Tex. 2012) (comparing the purposes, policies, procedural requirements, and remedies of the insurance code and the workers' compensation act to determine whether the Legislature intended to effectively provide two different remedies to injured workers); *City of Waco v. Lopez*, 259 S.W.3d 147, 155–56 (Tex. 2008) (considering the relationship between the Texas Whistleblower Act and the Texas Commission on Human Rights Act).

The fundamental purposes of these statutes are different. The DTPA and ALFLA are designed to promote the fundamental goals of protecting consumers and residents of assisted living facilities. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 17.44 (a) (DTPA); *PPG Indus., Inc.*, 146 S.W.3d at 84 (same); *with* TEX. HEALTH & SAFETY CODE ANN. § 247.0011(a) (ALFLA). The provisions at issue therein allow and engender a duty on the part of the State to enforce those statutes. The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort, and the welfare of the public. *Spann v. City of Dallas*, 111 Tex. 350, 355, 235

S.W. 513, 515 (1921). "Clearly, a legislature may grant standing to a state attorney general to bring suit for injury done to its citizens . . . as the Texas Legislature has done in many contexts." *Farmers Group, Inc. v. Lubin*, 222 S.W.3d 417, 426–27 (Tex. 2007).

In contrast, the TMLA was designed to address crises affecting medical and health care and medical malpractice insurance. The Texas Supreme Court recently addressed the historical purposes of the TMLA and its predecessors. *Fredericksburg Care Co., L.P. v. Perez*, No. 3-0573, 2015 WL 1035343, at *6–7 (Tex. Mar. 6, 2015). In 1977, the predecessor to the TMLA was expressly intended to reduce costs of medical insurance, and the reason for enactment was a "medical malpractice insurance crisis in the State of Texas." *Id.* at *6 (citing *Tex. W. Oaks Hosp., LP*, 371 S.W.3d at 177; *Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam)). In 2003, the predecessor to the TMLA was repealed, and the TMLA was enacted as a "statutory framework" governing health care liability claims as part of "a top-to-bottom overhaul" of Texas malpractice law to "make affordable medical and health care more accessible and available to the citizens of Texas" and to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *See id.* at *6 (citing *Tex. W. Oaks Hosp., LP*, 371 S.W.3d at 177; *CHCA Woman's Hosp., L.P.*, 403 S.W.3d at 232; *Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010)). The legislative history delineated the Legislature's concern that a spike in healthcare-liability claims had fueled an insurance crisis that was harming healthcare delivery in Texas. *See id.* (citing *Rankin*, 307 S.W.3d at 287). Fundamentally, the goal of the TMLA and its predecessor has been "to make health care in Texas more available and less expensive by reducing the cost of health care liability claims" and to "broaden[] access to health care

22

by lowering malpractice insurance premiums." *Id.* (citing *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014); *Scoresby*, 346 S.W.3d at 552. "In other words, Chapter 74 was a law enacted for the purpose of imposing tort reform to further the goal of making health care more affordable in Texas." *Id.* at *7.

The substantive and procedural requirements of the statutes implicated in this case are pervasively different and inconsistent and are far too numerous to detail herein. For example, the TMLA measures the limitations period from one of three dates: (1) the occurrence of the breach or tort; (2) the last date of the relevant course of treatment; or (3) the last date of the relevant hospitalization. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.251(a); *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001). In contrast, it is well-settled law that "the State in its sovereign capacity, unlike ordinary litigants, is not subject to the defenses of limitations, laches, or estoppel." *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993); *Thomas v. State*, 226 S.W.3d 697, 710 (Tex. App.—Corpus Christi 2007, pet. dism'd); *Brooks v. State*, 91 S.W.3d 36, 39 (Tex. App.—Amarillo 2002, no pet.); *Shields v. State*, 27 S.W.3d 267, 275 (Tex. App.—Austin 2000, no writ). Under the TMLA, a health care liability claimant must show that the defendant's act or omission complained of must proximately cause the injury to the claimant. *Rio Grande Valley Vein Clinic, P.A.*, 431 S.W.3d at 65. In contrast, to establish a DTPA violation, a plaintiff does not have to meet the higher standard of proximate causation, which includes foreseeability as an element; rather, "only [a] producing cause must be shown." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995); *see Bryant v. S.A.S.*, 416 S.W.3d 52, 65 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The TMLA provides for a limit on the "civil liability for all damages, including exemplary damages" for each

23

claimant. TEX. CIV. PRAC. & REM. CODE ANN. § 74.303 (West, Westlaw through 2013 3d C.S.). In contrast, both the DTPA and the ALFLA provide for standard civil penalties for each statutory violation and allow for the imposition of injunctive relief. *See* TEX. BUS. & COM. CODE ANN. § 17.47; TEX. HEALTH & SAFETY CODE ANN. § 247.045.

Emeritus contends that the fact that the statutes at issue contain conflicting procedural and substantive requirements is immaterial because the Legislature has already declared that the TMLA prevails against all other existing law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.002(a) (stating that, in the event of a conflict between this chapter and another law, including a rule of procedure or evidence or court rule, this chapter controls to the extent of a conflict); *Tex. W. Oaks*, 371 S.W.3d at 187–88; *see, e.g., Molinet*, 356 S.W.3d at 409 (concluding that statutory limitations period in TMLA controlled over conflicting limitations period in the civil practice and remedies code). Emeritus further contends that the broad language of the TMLA evinces legislative intent for the statute to have expansive application. *See Bioderm Skin Care, LLC*, 426 S.W.3d at 758; *Loaisiga*, 379 S.W.3d at 256. Emeritus alleges that the State's purported use of its "police powers" to multiply lawsuits against Texas's health care providers is contrary to the TMLA's purposes to reduce the frequency of health care liability claims and thereby make affordable medical and health care more accessible and available to the citizens of Texas.

When construing a statute, we consider the "object sought to be obtained" by the statute as well as the "consequences of a particular construction." TEX. GOV'T CODE ANN. § 311.023(1), (5) (West, Westlaw through 2013 3d C.S.); *see Tex. Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 354 (Tex. 2013); *State v. Hodges*, 92 S.W.3d 489,

24

494 (Tex. 2002). We concur with Emeritus's general assessment regarding the purposes of the TMLA, however, we construe statutes so as to harmonize with other relevant laws, if possible. *See In re United Services Auto. Ass'n*, 307 S.W.3d 299, 311 (Tex. 2010); *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 565 (Tex. 1984). In addition to the DTPA and ALFLA, the Texas Legislature has enacted a multitude of statutes which authorize the State to seek injunctive relief and civil penalties in cases against health care providers. *See, e.g.*, TEX. HEALTH & SAFETY CODE ANN. §§ 241.054–.055 (hospitals); *id.* §§ 242.063, 242.065 (convalescent and nursing homes); TEX. OCC. CODE ANN. §§ 165.051, 165.101 (physicians); §§ 201.601, 201.603 (chiropractors); §§ 202.601, 202.604 (podiatrists); §§ 264.051, 264.101–.102 (dentists); §§ 301.551, 301.553 (nurses); §§ 351.602–.603 (optometrists); §§ 453.451, 453.453 (physical therapists); §§ 501.501–.502 (psychologists); §§ 566.051, 566.101–.102 (pharmacists). If the TMLA were held to apply to the State in its sovereign capacity seeking civil penalties, it would eviscerate the Legislature's numerous statutory directives that give the State the responsibility and duty to enforce health care statutes to protect its citizens. Stated otherwise, the imposition of the TMLA's requirements on the State acting in its sovereign capacity would significantly undermine the State's legislatively imposed duties under other statutory schemes to protect its citizens.

Based on the foregoing, we sustain the State's first issue. The State is not subject to the expert report requirement in the TMLA when it, pursuant to its police power and acting in its sovereign capacity, seeks statutory civil penalties and injunctive relief. Accordingly, the trial court erred in granting Emeritus's motion to dismiss under the TMLA. Because we have determined that the trial court erred in granting Emeritus's motion to

dismiss, we further sustain the State's second issue pertaining to the assessment of attorney's fees and costs under section 74.351(b). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

## V. CONCLUSION

Having sustained the State's first and second issues, we reverse the trial court's order granting Emeritus's motion to dismiss and awarding attorney's fees against the State, and we remand this case to the trial court for further proceedings consistent with this opinion.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice


Delivered and filed the
26th day of March, 2015.