SEE AMEND BRF
FLD ON 8/19/15

ACCEPTED
03-15-00252-CV
6435117
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 7:41:59 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00252-CV

# In the Court of Appeals for the Third Judicial District of Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 7:41:59 PM
JEFFREY D. KYLE
Clerk

DR. BEHZAD NAZARI, D.D.S. D/B/A ANTOINE DENTAL
CENTER ET. AL., DEFENDANTS–APPELLANTS

*v.*

STATE OF TEXAS, PLAINTIFF–APPELLEE,

*v.*

XEROX CORPORATION AND XEROX STATE HEALTHCARE, LLC, F/K/A ACS
STATE HEALTHCARE, LLC, THIRD-PARTY DEFENDANTS–APPELLEES.

On Appeal from the 53rd Judicial District Court,
Travis County, Texas, No. D-1-GB-13-005380

## BRIEF FOR APPELLEE THE STATE OF TEXAS

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

RAYMOND C. WINTER
Chief, Civil Medicaid Fraud

REYNOLDS B. BRISSENDEN
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

SCOTT A. KELLER
Solicitor General

J. CAMPBELL BARKER
Deputy Solicitor General
State Bar No. 24049125
cam.barker@texasattorneygeneral.gov

PHILIP A. LIONBERGER
Assistant Solicitor General
State Bar No. 12394380

AUTUMN HAMIT PATTERSON
Assistant Attorney General
State Bar No. 24092947

Counsel for the State of Texas

*Oral argument requested*

# Identity of Parties and Counsel

The parties and their trial and appellate counsel are as follows:

**Plaintiff–Appellee:**

- The State of Texas

**Counsel for Plaintiff–Appellee:**

| | |
|---|---|
| J. Campbell Barker | Raymond C. Winter |
| Autumn Hamit Patterson | Reynolds B. Brissenden |
| Philip A. Lionberger | David Drew Wright |
| Office of the Attorney General | Office of the Attorney General |
| P.O. Box 12548 (MC 059) | P.O. Box 12548 (MC 056) |
| Austin, Texas 78711-2548 | Austin, Texas 78711-2548 |

**Defendants–Appellants:**

- Dr. Behzad Nazari, D.D.S. d/b/a Antoine Dental Center
- Dr. Behzad Nazari
- Dr. Wael Kanaan
- Harlingen Family Dentistry, P.C., n/k/a Practical Business Solutions, Series LLC
- Juan D. Villareal D.D.S., Series, PLLC d/b/a Harlingen Family Dentistry Group
- Dr. Juan Villareal
- Dr. Vivian Teegardin
- Richard F. Herrscher, D.D.S., M.S.D., P.C.
- Dr. Richard F. Herrscher
- M & M Orthodontics, PA
- Dr. Scott Malone
- Dr. Diana Malone
- Michelle Smith
- National Orthodontix, MGMT, PLLC
- Dr. John Vondrak
- RGV Smiles by Rocky L. Salinas, D.D.S. PA
- Dr. Rocky Salinas

**Counsel for Defendants–Appellants:**

Jason Ray
Riggs & Ray, P.C.
700 Lavaca St., Suite 920
Austin, Texas 78701

E. Hart Green
Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
P.O. Box 350
Beaumont, Texas 77704-0350

**Third-Party Defendants–Appellees:**

- Xerox Corporation
- Xerox State Healthcare, LLC f/k/a ACS State Healthcare, LLC

**Counsel for Third-Party Defendants–Appellees:**

Constance H. Pfeiffer
Beck Redden LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010

Robert C. Walters
Gibson, Dunn & Crutcher LLP
2100 McKinney Ave., Suite 1100
Dallas, Texas 75201

Eric J.R. Nichols
Christopher R. Cowan
Beck Redden LLP
515 Congress Ave., Suite 1750
Austin, Texas 78701

# Table of Contents

Page

Identity of parties and counsel .................................................................i

Index of authorities ...............................................................................iv

Statement of the case .............................................................................x

Statement regarding oral argument .......................................................xi

Statement of jurisdiction........................................................................xi

Issues presented.....................................................................................xi

Statement of facts ................................................................................. 1

    A.  Medicaid program overview............................................................. 1

    B.  Medicaid fraud controls ................................................................. 4

    C.  Facts regarding defendant dental groups........................................ 6

    D.  Facts regarding Xerox .................................................................... 8

    E.  Procedural history.......................................................................... 9

Summary of the argument..................................................................... 12

Argument............................................................................................. 14

I.  The district court correctly dismissed defendants' counterclaims based on sovereign immunity. ............................................................... 14

    A.  The Legislature has not waived sovereign immunity........................ 15

    B.  No common-law exception to immunity applies............................... 18

        1.  Because the State acts within its sovereign powers in bringing this TMFPA enforcement action, it does not leave its sphere of sovereign immunity from suit............................... 18

        2.  Additionally, defendants' counterclaims fall outside the class of counterclaims covered by the *Reata* exclusion from sovereign immunity. ............................................................... 33

        3.  Even were it relevant, federal precedent would also bar defendants' counterclaims against the State in a False Claims Act suit. ...................................................................... 37

    C.  The counterclaims are in the nature of an estoppel affirmative defense that does not apply here. .................................................. 39

II.  This Court lacks jurisdiction over defendants' interlocutory appeal from the dismissal of their third-party claims against Xerox. ................. 43

Prayer .................................................................................................. 46

Certificate of service ............................................................................ 48

Certificate of compliance ...................................................................... 49

## Index of Authorities

Page(s)

**Cases:**

*Anderson, Clayton & Co. v. State ex rel. Allred*,
62 S.W.2d 107 (Tex. Comm'n App. 1933, judgm't adopted) .... 21, 22, 23

*Bally Total Fitness Corp. v. Jackson*,
53 S.W.3d 352 (Tex. 2001) ........................................................... 43–44

*Bates v. Republic*,
2 Tex. 616 (1847) ........................................................................ 20, 24

*Beers v. Arkansas*,
61 U.S. (20 How.) 527 (1857) ............................................................ 18

*Bobbitt v. Cantu*,
992 S.W.2d 709 (Tex. App.—Austin 1999, no pet.) ........................ 44, 45

*Challenger Gaming Solutions, Inc. v. Earp*,
402 S.W.3d 290 (Tex. App.—Dallas 2013, no pet.) .............................. 46

*City of Dallas v. Albert*,
354 S.W.3d 368 (Tex. 2011) ........................................................ *passim*

*City of Dallas v. Redbird Dev. Corp.*,
143 S.W.3d 375 (Tex. App.—Dallas 2004, no pet.) ............................... 30

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ............................................................. 22

*City of Galveston v. State*,
217 S.W.3d 466 (Tex. 2007) ......................................................... 26–27

*City of Hutchins v. Prasifka*,
450 S.W.2d 829 (Tex. 1970) ............................................................. 40

*City of New Braunfels v. Carowest Land, Ltd.*,
432 S.W.3d 501 (Tex. App—Austin 2014, no pet.) .......................... 30, 36

*City of San Antonio v. KGME, Inc.*,
340 S.W.3d 870 (Tex. App.—San Antonio 2011, no pet.) ..................... 30

*City of White Settlement v. Super Wash, Inc.*,
198 S.W.3d 770 (Tex. 2006) ......................................................... 39, 40

*Dickson v. Dickson*,
516 S.W.2d 28 (Tex. Civ. App.—Austin 1974, no writ) ............ 44, 45, 46

*Dillard v. Tex. Elec. Co-op*,
157 S.W.3d 429 (Tex. 2005) ............................................................. 36

*Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*,
   275 F.3d 384 (4th Cir. 2001) .......................................................32

*Ex parte Young*,
   209 U.S. 123 (1908) .................................................................. 22

*Fed. Sign v. Tex. S. Univ.*,
   951 S.W.2d 401 (Tex. 1997) ......................................................30

*Gabelli v. SEC*,
   133 S. Ct. 1216 (2013) .............................................................. 24

*Gen. Servs. Comm'n v. Little-Tex. Insulation Co.*,
   39 S.W.3d 591 (Tex. 2001) ................................................. 15, 25

*Guillory v. Port of Houston Auth.*,
   845 S.W.2d 812 (Tex. 1993) ......................................................19

*Harlingen Family Dentistry, P.C. v. HHSC*,
   452 S.W.3d 479 (Tex. App.—Austin 2014, pet. filed) ...........................7

*Harris Cnty. v. Luna-Prudencio*,
   294 S.W.3d 690 (Tex. App.—Houston [1st Dist.] 2009, no pet.)..........30

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984) ......................................................... 3, 40, 41

*Henderson v. Shell Oil Co.*,
   182 S.W.2d 994 (Tex. 1944)...................................................... 44

*In re Malinowski*,
   156 F.3d 131 (2d Cir. 1998) ......................................................34

*In re S.A.P.*,
   156 S.W.3d 574 (Tex. 2005) ...................................................... 42

*In re Univ. Med. Ctr.*,
   973 F.2d 1076 (3d Cir. 1992) ....................................................34

*Jack B. Anglin Co. v. Tipps*,
   842 S.W.2d 266 (Tex. 1992) ............................................... 43, 45

*Janek v. Harlingen Family Dentistry, P.C.*,
   451 S.W.3d 97 (Tex. App.—Austin 2014, no pet.) .............................7–8

*Lee v. Schweiker*,
   739 F.2d 870 (3d Cir. 1984)......................................................34

*Lehmann v. Har-Con Corp.*,
   39 S.W.3d 191 (Tex. 2001) ................................................. 43, 45

*Qwest Commc'ns Corp. v. AT&T Corp.*,
24 S.W.3d 334 (Tex. 2000) ...................................................... 44

*Reata Construction Corp. v. City of Dallas*,
197 S.W.3d 371 (Tex. 2006) ......................................... *passim*

*Rusk State Hosp. v. Black*,
392 S.W.3d 88 (Tex. 2012) ................................................ 15

*SEC v. City of Miami*,
581 F. App'x 757 (11th Cir. 2014) ..................................... 24

*Stary v. DeBord*,
967 S.W.2d 352 (Tex. 1998) ............................................. 44

*State v. City of Greenville*,
726 S.W.2d 162 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ................. 27

*State v. Durham*,
860 S.W.2d 63 (Tex. 1993) ............................................... 42

*State v. Emeritus Corp.*,
No. 13-13-00529-CV, 2015 WL 1456436 (Tex. App.—Corpus
Christi Mar. 26, 2015, pet. filed) ............................................ 24

*State v. Zanco's Heirs*,
18 Tex. Civ.  App. 127, 44 S.W. 527 (1898, writ ref'd) ......................... 29

*Sweeny Cmty. Hosp. v. Mendez*,
226 S.W.3d 584 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ......... 30

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ............................................. 15

*Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*,
397 S.W.3d 162 (Tex. 2013) ............................................. 40

*Tex. Dep't of Transp. v. Jones*,
8 S.W.3d 636 (Tex. 1999) ................................................ 15

*Tex. Natural Res. Conservation Comm'n v. IT-Davy*,
74 S.W.3d 849 (Tex. 2002) ........................................... 14, 27

*United States ex rel. Madden v. Gen. Dynamics Corp.*,
4 F.3d 827 (9th Cir. 1993) ................................................ 38

*United States v. Campbell*,
No. 08-cv-1951, 2011 WL 43013 (D.N.J. Jan. 4, 2011) ................... 38, 39

*Waller County v. Simmons*,
No. 01-07-00180-CV, 2007 WL 3038420 (Tex. App.—Houston
[1st Dist.] Oct. 18, 2007, no pet.) ................................................ 30–31

*Wichita Falls State Hosp. v. Taylor*,
106 S.W.3d 692 (Tex. 2003) ........................................... *passim*

*Wyeth-Ayerst Labs. Co. v. Medrano*,
28 S.W.3d 87 (Tex. App.—Texarkana 2000, no pet.) ............................46

**Statutes, regulations, and rules:**

42 U.S.C. § 1396a(a)(43) .................................................................1

Tex. Civ. Prac. & Rem. Code ch. 105 .................................... 17, 29

Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) .................................. xi, 43, 45

Tex. Gov't Code:

§ 311.005.......................................................................... 4

§ 311.034..........................................................................16, 17

§ 531.102(g)(2)...................................................................7

Tex. H.B. 1396, Act of May 31, 2015, 84th Leg., R.S., ch. 1251,
§ 27, 2015 Tex. Sess. Law Serv. 1251 .......................................5

Tex. Hum. Res. Code:

§ 32.001 ........................................................................1

§ 32.024(a) ....................................................................1

§ 32.024(b) ....................................................................1

tit. 2, subt. C, ch. 36 ........................................................ 1, 4

§ 36.0011.......................................................................5

§ 36.0011(a) ..................................................................37

§ 36.0011(b) ..................................................................37

§ 36.002(1)....................................................................5

§ 36.002(2) ....................................................................5

§ 36.002(13) ..................................................................5

§ 36.003 ........................................................................5

§ 36.007 ........................................................................ 6

§ 36.051 ........................................................................ 6

§ 36.052 ........................................................................ 6

Tex. Hum. Res. Code (cont'd):

§ 36.052(a)...................................................................31, 32, 46

§ 36.054 ............................................................................5

§ 36.101.............................................................................6

§ 36.101(a) ........................................................................6

§ 36.102 .............................................................................6

§ 36.104 .............................................................................6

§ 36.106 .............................................................................6

§ 36.107.............................................................................6

§ 36.107(b) ........................................................................6

§ 36.107(d) ........................................................................6

§ 36.110.............................................................................6

§ 36.111 .............................................................................6

§ 36.112 ........................................................................17, 29

§ 36.113 .............................................................................6

§ 36.116 ........................................................................17, 29

Tex. Penal Code § 35A.02 ..................................................4–5

1 Tex. Admin. Code tit. I, part 15, ch. 371, subch. G.....................4

1 Tex. Admin. Code § 371.1709(b) ........................................7

25 Tex. Admin. Code § 33.2(2)...............................................1

25 Tex. Admin. Code § 33.2(8)...............................................2

25 Tex. Admin. Code § 33.2(8)(A) ..........................................2

25 Tex. Admin. Code § 33.2(8)(F)...........................................2

25 Tex. Admin. Code § 33.40(b)..............................................1

25 Tex. Admin. Code § 33.71(a)..............................................2

42 C.F.R. § 455.2 ..............................................................7

42 C.F.R. § 455.23(a)..........................................................7

Tex. R. Civ. P. 38(a) .....................................................11, 46

Tex. R. Civ. P. 91a .............................................................46

**Other authorities:**

2003 Texas Medicaid Provider Procedures Manual ...................................... 2

2003 Texas Medicaid Provider Procedures Manual § 18.20.7 ...................... 4

2003 Texas Medicaid Provider Procedures Manual § 2.1.1 ...........................3

2003 Texas Medicaid Provider Procedures Manual § 2.2.7..........................3

2003 Texas Medicaid Provider Procedures Manual § 2.3 .............................3

2003 Texas Medicaid Provider Procedures Manual, § 18.20.1 ...................2, 3

HHSC, *Texas Medicaid and CHIP in Perspective* (10th ed. 2015) ....................1

*The Federalist No. 81* (Alexander Hamilton) .................................................. 19

U.S. Sentencing Guidelines § 2B4.1.............................................................32

# Statement of the Case

*Nature of the case:*      This is an action under the Texas Medicaid Fraud Prevention Act seeking statutory remedies from dental groups for material misrepresentations to the Texas Medicaid program.

*Trial court:*      53rd Judicial District Court, Travis County, The Honorable Stephen Yelenosky

*Course of proceedings:*      The State brought this civil enforcement action. CR.3–25. Defendants answered with a general denial. CR.30. They also asserted counterclaims against the State and third-party claims against the State's claims-processing contractor (Xerox). CR.30–42. In response, the State filed a general denial, plea to the jurisdiction to the counterclaims, plea in bar to the counterclaims, and motion to dismiss the third-party claims. CR.43–58.

*Trial court disposition:*      The trial court granted the State's plea to the jurisdiction and dismissed the counterclaims with prejudice. CR.383–84. The court also granted the State's motion to dismiss the third-party claims. *Id.*

## STATEMENT REGARDING ORAL ARGUMENT

The State believes that the briefing suffices to resolve this appeal. If oral argument would be helpful to the Court, however, the State respectfully requests time equal to that allotted to defendants.

## STATEMENT OF JURISDICTION

This Court's jurisdiction over defendants' interlocutory appeal from the dismissal of their counterclaims against the State rests on Texas Civil Practice and Remedies Code § 51.014(a)(8).

This Court does not have jurisdiction over defendants' interlocutory appeal from the dismissal of their third-party claims against Xerox because no statute authorizes such an appeal. *See infra* Part II.

## ISSUES PRESENTED

1.  Whether the district court correctly granted the State's plea to the jurisdiction and dismissed defendants' counterclaims against the State based on sovereign immunity.

2.  Whether this Court has appellate jurisdiction over defendants' interlocutory appeal from the dismissal of their third-party claims against Xerox (and if so whether that dismissal was correct).

## Statement of Facts

This is a civil enforcement action by the State against dental groups for making material misrepresentations to the Texas Medicaid program, in violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code tit. 2, subt. C, ch. 36. The Clerk's Record is cited herein as "CR."

### A. Medicaid program overview

Texas Medicaid, funded by the federal and state government, is a program designed to provide medical assistance to needy individuals. Tex. Hum. Res. Code § 32.001. Administered by the Texas Health and Human Services Commission ("HHSC"), the program is charged with providing assistance to a range of beneficiaries, from low-income families, to children, to individuals with disabilities. *See* Tex. Hum. Res. Code § 32.024(a)–(b); HHSC, *Texas Medicaid and CHIP in Perspective* 1-1 to 1-2 (10th ed. 2015), www.hhsc.state.tx.us/medicaid/about/PB/PinkBook.pdf.

Among other things, Texas Medicaid provides certain persons with periodic dental exams and with "medically necessary" follow-up dental treatment. 25 Tex. Admin. Code § 33.40(b); *see* 42 U.S.C. § 1396a(a)(43) (providing for this early-screening-and-treatment program). Those services, provided in Texas under the moniker Texas Health Steps, are made available to Medicaid-eligible persons who are under 21 years of age. 25 Tex. Admin. Code § 33.2(2) (defining the term "client").

Medicaid does not cover orthodontic services for cosmetic reasons, such as to straighten a twisted or rotated tooth. *See* 25 Tex. Admin. Code §§ 33.2(8), 33.71(a). Rather, orthodontic services are covered only if needed due to an unusual medical conditions affecting a person's secondary (adult) teeth, namely, "severe handicapping malocclusion and other related conditions." *Id.* § 33.71(a). That standard follows from general Medicaid policy reserving scarce public funds for only those services needed to prevent or cure conditions that cause suffering or pain, physical deformity or disability, or a threat to life or bodily functioning. *Id.* § 33.2(8)(A), (F).

To ensure that Medicaid funding is being used only to treat patients with severe handicapping malocclusion, such a condition must be "measured by the procedures and standards published in" the Texas Medicaid Provider Procedures Manual. *Id.*; *see 2003 Texas Medicaid Provider Procedures Manual*, www.tmhp.com/TMHP_File_Library/Provider_Manuals/TMPPM/ Archives%20(TMPPM%202003,%202004)/2003_TMPPM.pdf (short URL: goo.gl/7WGrQ0) (version in effect at beginning of alleged period of fraud; hereinafter *Provider Manual*). Moreover, orthodontic services for which a provider seeks payment must be "prior authorized." 25 Tex. Admin. Code § 33.71(a). Prior authorization requires providers to provide full and accurate information to the Medicaid program, allowing for review of whether the proposed treatment meets the criteria for coverage. *See Provider Manual* 18-44, § 18.20.1.

Crucially, given the size of the program, the State relies not only on its own processes but also on the duty of enrolled providers themselves to honestly represent patients' condition when seeking prior authorization and to know and adhere to Medicaid policies and requirements. Any provider seeking payment from Medicaid accepts a responsibility to maintain a current understanding of Medicaid policies and procedures, to abide by them and claim payment only for covered services, and to submit full and complete claims information. *Provider Manual* 2-2, § 2.1.1 (requirement of provider agreement); *id.* at 2-7, § 2.2.7 (provider agrees that all information on a claim is true, accurate, and complete); *id.* at 2-11, § 2.3 (duty to maintain current understanding of procedures and policies); *cf. Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds."). Providers are warned that omitting pertinent facts or submitting false statements, whether to obtain greater compensation than allowed or to meet prior-authorization requirements, is forbidden and has consequences. *Provider Manual* 2-11, § 2.3.

In the orthodontia context, a request for prior authorization must feature a complete orthodontic treatment plan and be accompanied by items and information demonstrating that the patient has severe handicapping malocclusion. *See Provider Manual* 18-44, § 18.20.1 (requiring, e.g., dental

models, x-rays, photographs, and a scoresheet reflecting the severity of a client's dental deformities); *see, e.g.*, *id.* 18-49 to 18-50, § 18.20.7 (detailed instructions for completing scoresheet, including instruction that scoring must be conservative because the program can address only "handicapping" malocclusion). With accurate information submitted, the request for prior authorization is approved or denied. Here, that review function was assigned to a claims-administration company contracted by Texas Medicaid to perform the prior-authorization reviews (Xerox). CR.45–46.

## B. Medicaid fraud controls

When anyone makes false statements to the Texas Medicaid program—whether a medical practitioner, a drug company, or a state contractor—the public fisc is jeopardized. Three general categories of enforcement proceedings exist to deter such violations. The HHSC Office of the Inspector General can bring administrative enforcement proceedings against enrolled medical-services providers, to cut off funds or exclude them from the Medicaid program. *See* 1 Tex. Admin. Code tit. I, part 15, ch. 371, subch. G ("Administrative Actions and Sanctions"). Additionally, the State can bring a civil proceeding for statutory remedies against a person who makes false statements to Texas Medicaid, whether that person is a provider or contractor. *See* Tex. Hum. Res. Code tit. 2, subt. C, ch. 36 (Texas Medicaid Fraud Prevention Act or "TMFPA"); Tex. Gov't Code § 311.005. Finally, the State can bring criminal charges for Medicaid fraud. *See* Tex. Penal Code

§ 35A.02 (amended to increase penalties by Tex. H.B. 1396, Act of May 31, 2015, 84th Leg., R.S., ch. 1251, § 27, 2015 Tex. Sess. Law Serv. 1251).

This case is the second type of enforcement action—a civil action under the Texas Medicaid Fraud Prevention Act. CR.110. The TMFPA defines several "unlawful acts" related to the Medicaid program, several of which the State intends to prove here. CR.120–127; *see, e.g.*, Tex. Hum. Res. Code § 36.002(1) ("knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized"); *id.* § 36.002(2) ("knowingly conceals or fails to disclose information that permits" such overpayment); *id.* § 36.002(13) (knowingly commits cross-referenced conduct, including presenting information a person should know to be false and soliciting or receiving a kickback for referrals to third parties). A person can "knowingly" commit a TMFPA violation without awareness of the TMFPA or that his conduct violates the TMFPA; a "knowing" violation requires only reckless disregard or conscious indifference to the truth of information submitted to the Texas Medicaid program. *Id.* § 36.0011.

The Attorney General has a range of enforcement powers under the TMFPA, such as civil investigative demands and inspection of agency records. *Id.* §§ 36.003, 36.054. To adequately punish and deter Medicaid fraud, the State may recover from any person who violates the Act a civil remedy of three times the amount of any Medicaid payment that is made directly or

indirectly as a result of the unlawful act, plus additional civil penalties, reasonable attorney's fees, and costs. *Id.* §§ 36.007, 36.052. Augmenting the State's enforcement efforts, private plaintiffs may institute actions in the State's name as *qui tam* relators, although the State remains the real party in interest and retains ultimate control over the action. *Id.* §§ 36.101, 36.107(b), (d).[1]

## C. Facts regarding defendant dental groups

The State's petition sets forth the facts the State intends to prove in this case, described below. CR.117–31. Defendants are six dental groups and affiliated persons (referred to for convenience here simply as dental groups). CR.117–19. Seeking to receive funds from Texas Medicaid, these dental groups enrolled as Medicaid providers and agreed to abide by the Provider Manual and Medicaid regulations. CR.116.

This civil enforcement action arises on the State's allegations that defendants enriched themselves by making misrepresentations to the Medicaid system. CR.120–27. Specifically, the State intends to prove that defendants violated the TMFPA in connection with orthodontic services by

---

[1] The TMFPA establishes comprehensive rules governing *qui tam* actions. For example, only the State or a *qui tam* relator can bring suit, and no one but the State can intervene in a TMFPA suit. Tex. Hum. Res. Code §§ 36.051, 36.101(a), 36.106. Strict rules govern when a *qui tam* relator can bring suit and what percentage of awards a *qui tam* relator can receive. Tex. Hum. Res. Code §§ 36.110, 36.111, 36.113. The TMFPA also dictates how a *qui tam* relator must initiate the action and how the action will continue based on whether the State decides to intervene. Tex. Hum. Res. Code §§ 36.102, 36.104, 36.107.

making misrepresentations on prior-authorization forms, to misstate the severity of patients' dental conditions in order to receive payment for services not covered by Medicaid. CR.120–27. All defendants are accused of that type of misrepresentation. *Id.* Additionally, certain defendant dental groups are accused of other violations, including making claims for services and products never provided or more costly than provided, soliciting kickbacks for referral of patients to third parties, and falsifying the credentials of persons who performed work for which claims were filed. *Id.* Defendants filed a general denial. CR.30.

Before the State brought this civil enforcement action, HHSC through its Office of the Inspector General pursued administrative remedies against most of the defendant dental groups. CR.45. Those remedies can include an administrative payment hold on claims for reimbursement by dental groups. *See* Tex. Gov't Code § 531.102(g)(2) (requiring payment hold in certain circumstances); 1 Tex. Admin. Code § 371.1709(b) (describing payment hold); *see* 42 C.F.R. § 455.23(a) (requiring that a State's Medicaid program suspend payments upon finding a "credible allegation of fraud"); *id.* § 455.2 (defining "credible allegation of fraud"). One of the dental groups named in this case appealed from the administrative payment hold imposed on it, and this Court ruled on issues related to the payment hold. *See Harlingen Family Dentistry, P.C. v. HHSC*, 452 S.W.3d 479 (Tex. App.—Austin 2014, pet. filed); *Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97 (Tex.

- 7 -

App.—Austin 2014, no pet.). Those cases do not address any issues presented in this case, but they are noted here for the sake of completeness. In December 2014, HHSC dismissed its administrative enforcement actions, and the State filed this civil enforcement action. CR.45.

### D. Facts regarding Xerox

In May 2014, before this lawsuit was filed, the State sued three companies for making misrepresentations related to implementation of the Texas Medicaid program, in violation of the TMFPA. CR.45 (describing that separate Travis County District Court lawsuit, Case No. D-1-GV-14-000581). Those three companies are Xerox Corporation; Xerox State Healthcare, LLC; and ACS State Healthcare, LLC, a Xerox Corporation ("Xerox," collectively). CR.45.

Xerox was under contract to the Texas Medicaid program to perform claims-administration services. CR.45. Those services included providing qualified medical personnel and having them perform a substantive review of prior-authorization requests and apply Texas Medicaid policies to reject or approve those requests. CR.45–46. Investigations into Xerox's conduct culminated in the termination of Xerox's contract and the lawsuit against Xerox. That lawsuit alleges that Xerox violated the TMFPA by making misrepresentations to Texas officials about its failure to provide qualified medical professionals and personnel to review prior-authorization requests. CR.106 (copy of motion paper in that lawsuit, which is also presided over by Judge Yelenosky).

Some of the dental groups attempted to intervene in the State's separate action against Xerox, but the trial court struck the petition in intervention. CR.47; CR.61 (copy of trial court's order in that case). Likewise, the trial court denied Xerox's motion to consolidate the suit against it for its conduct with separate suits by the State against dental groups for their own conduct. CR.47. The trial court explained that the State is "entitled to pursue a Medicaid Fraud claim against a defendant to the exclusion of all other parties." CR.65 (copy of trial court's order in that case).

## E. Procedural history

The State filed this TMFPA enforcement action against the dental groups. CR.3. Defendants answered with a general denial. CR.30. They also alleged damages counterclaims against the State, claiming that the State had waived sovereign immunity by filing this enforcement action. CR.30. Like defendants' earlier attempt to intervene in the State's action against Xerox, defendants' counterclaims appear to try to blame the State or at Xerox for defendants' own conduct. Specifically, the counterclaims allege:

(1) Conspiracy by the State with Xerox "to allow Xerox to violate its various contractual duties" by "rubber stamp[ing]" or doing "no legitimate review" of prior authorizations. CR.31. Defendants' apparent theory of causation is that this rubber stamping caused them to succeed in and continue submitting prior authorizations with misrepresentations, which in turn exposed them to enforcement actions. *See* CR.31 (alleging injury to them by the State's "recouping money from providers" through enforcement proceedings).

(2) Breach of the State's contract with Xerox, "which allowed non-performance by Xerox." CR.32. Again, defendants' theory of liability

is that the State caused defendants to incur liability for violating the law because the State did not catch defendants at the outset. CR.32 (alleging that the State is liable to defendants in the amount of the State's own claims against defendants in this action).

(3) Conversion by HHSC instituting the administrative payment holds. CR.32–33. Defendants allege that this is conversion on the theory that the prior authorization they received (based on their own statements) confers unconditional entitlement to payment. CR.32–33.

As remedies on their counterclaims, defendants pray for over a million dollars from the State. CR.31–33.

In addition to those counterclaims, defendants filed a third-party petition against Xerox. CR.33. On much the same theories as underlie their counterclaims against the State, defendants alleged that Xerox is liable to them in damages for: (1) common law fraud, (2) breach of Xerox's contract with the State, (3) promissory estoppel, (4) negligent hiring and supervision, (5) negligence, (6) negligent misrepresentation, and (7) gross negligence and misapplication of fiduciary property. CR.34–39. Defendants also made a contribution claim against Xerox for complete satisfaction of defendants' liability to the State in this enforcement action. CR.40.

In response to the counterclaims, the State filed a general denial along with a plea to the jurisdiction, a plea in bar, and a motion to dismiss the third-party claims. CR.43-58. The plea to the jurisdiction rested on the State's sovereign immunity, which the State explained is jurisdictional and is not waived in an enforcement action under the TMFPA. CR.46–50. Defendants' counterclaims cited only a single case for the alleged waiver of sovereign immunity. CR.30 (citing *Reata Construction Corp. v. City of Dallas*, 197

S.W.3d 371, 377 (Tex. 2006)). The State explained that their reliance is misplaced because the governmental entity in the cited case proceeded as a market participant and not a sovereign and, moreover, because the scope of the waiver in that case would not embrace defendants' counterclaims here. CR.48–49.

The plea in bar addressed the fact that four of the dental groups asserting counterclaims here had previously raised those same claims against the State in other actions, only to have those claims dismissed on a plea to the jurisdiction. CR.52–54 (explaining issue-preclusion principles).

The State's motion to dismiss the third-party claims against Xerox rested on the fact that the TMFPA does not allow a defendant who made misrepresentations to Medicaid to reduce or eliminate its liability by claiming against a third party, which would be contrary to the text and deterrent scheme of the Act. CR.55 (adopting by reference arguments made at CR.91–108). The State thus explained that defendants could not file a third-party claim because Xerox is not a party that "may be liable to [defendants] for all or part of [the State's] claim against [them]." Tex. R. Civ. P. 38(a). The State also suggested that the third-party claims against Xerox could be barred by sovereign immunity because Xerox was contracted to perform functions as the State's Medicaid claims administrator. CR.55–57.

After receiving defendants' responses and the State's reply, CR.141–56, 265–75, 323–40, the trial court granted the State's plea to the jurisdiction and dismissed the counterclaims with prejudice, CR.384. The court also

granted dismissal of the third-party claims. The trial judge noted that his ruling is "consistent with my prior rulings interpreting the TMFPA," CR.382, in which he held that "the State is entitled to bring this action against defendants to the exclusion of all other parties." CR.384.

Defendants filed a timely notice of appeal. CR.385–87.

## Summary of the Argument

1. The district court correctly granted the State's plea to the jurisdiction and dismissed defendants' counterclaims against the State. This is an enforcement action under the Texas Medicaid Fraud Prevention Act, brought by the State in an exercise of its police powers to seek statutory remedies for violations of Medicaid rules and regulations. The Legislature has not waived the State's sovereign immunity from suit when it brings such a civil enforcement action. Nor does the State's initiation of such a civil enforcement action allow third parties to sue the State for liability, any more than the State's initiation of a criminal enforcement action would allow that result. When the State acts as a sovereign in bringing law-enforcement actions, rather than as a market participant bringing claims seeking damages in the same way an ordinary litigant can, courts do not hold that the State steps outside its sphere of sovereign immunity from suit. Defendants wrongly argue that a case about the government acting as an ordinary litigant means that the State falls within an exemption from sovereign immunity any time it brings an action seeking a monetary remedy. No court has reached

such a conclusion, which would erect serious impediments to the State's law-enforcement efforts.

The district court's dismissal of defendants' counterclaims can be affirmed on an alternative basis as well. Even assuming that the State's initiation of this enforcement action allows the limited class of counterclaims to which a private damages action could expose the State, the counterclaims here do not fall within that limited class. Such counterclaims must be sufficiently connected with and properly responsive to the State's asserted claim. Here, however, the State asserts a violation of the Texas Medicaid Fraud Prevention Act by certain false statements. No part of the State's case involves whether those false statements went undetected for any amount of time or whether they should have been detected. Such determinations have no consequence because the Medicaid system imposes a duty on enrolled providers to act scrupulously in their own dealings with the State, and they are penalized for failing in that duty alone.

Even if the Court accepted defendants' comparison to federal law governing liability from suit in federal court, it would not help defendants. Under that law too, the counterclaims here would not fall within an exemption to a government's sovereign immunity because the counterclaims seek what is effectively indemnification, asserting that the government is liable to defendants because its conduct has caused their liability for submitting false claims. Such assertions do not allow counterclaims against the sovereign under either Texas law or federal law. Rather, those assertions amount to an

argument for recognition of the affirmative defense of estoppel. Such an affirmative defense is not the same as a counterclaim for damages. And such an affirmative defense is not available in cases in which it affects governmental functions, including in a TMFPA action.

Defendants can of course resist the State's claim in the usual course, including by putting on evidence to argue that their statements to Texas Medicaid were not incorrect or that they did not know that their statements were incorrect. Defendants cannot, however, respond to this law-enforcement action with counterclaims asserting that the State is liable to defendants for causing defendants' conduct underlying this proceeding.

2.   This Court lacks appellate jurisdiction over the district court's dismissal of defendants' third-party claims against Xerox because that order is interlocutory and no statute permits an appeal from it. The statutory permission to appeal on the State's successful plea to the jurisdiction does not extend to any other ruling simply because it is in the same order.

## ARGUMENT

### I. The District Court Correctly Dismissed Defendants' Counterclaims Based on Sovereign Immunity.

The trial court correctly dismissed defendants' counterclaims for lack of jurisdiction based on the State's sovereign immunity from suit. *See Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). There has been no waiver of sovereign immunity, and no common-law exception to sovereign immunity applies.

## A. The Legislature has not waived sovereign immunity.

Sovereign immunity is a common-law doctrine, depriving a court of jurisdiction unless the State consents to suit by waiving its immunity. *City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam).[2] Of course, if the doctrine of sovereign immunity does not cover certain claims in the first place, then those claims will not be barred even though immunity has not been "waived."

Defendants argue that the State waived its sovereign immunity by filing this suit. Appellants' Br. 8–9; *see also* CR.30 (defendants' counterclaims asserting waiver of sovereign immunity because the State brought this action). That is incorrect. A waiver exists only when the State enacts "a statute or resolution [that] contain[s] a clear and unambiguous expression of the Legislature's waiver of immunity" to consent to suit. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 93 (Tex. 2012); *Gen. Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001).

Defendants do not seriously contend that such a waiver exists, and the authority upon which they principally rely, *Reata Construction Corp. v. City*

---

[2] For simplicity, this brief uses the term "sovereign immunity" to include the immunity of the sovereign State of Texas and its agencies, as well as the immunity of other governmental entities that is often described as "governmental immunity." *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003).

*of Dallas*, 197 S.W.3d 371 (Tex. 2006), is not a waiver case. Rather, that case concerns the scope of immunity as an initial matter—the circumstances in which immunity does not exist at common law. The Supreme Court in *Reata* thus distinguished "waiver," which may occur only by legislative or constitutional enactment, from judicial interpretation of the scope of sovereign immunity. *Id.* at 375 (distinguishing "waiver" from "the judiciary's responsibility to define the boundaries of the common-law doctrine and to determine under what circumstances sovereign immunity exists in the first instance"); *accord Albert*, 354 S.W3d at 375 (noting that the *Reata* court had jurisdiction to hear the claims against the governmental entity, "not because the entity effected a change in its immunity by filing a claim, but because the judiciary has abrogated the entity's common law immunity from suit as to certain offsetting claims"). The State adheres to that strict usage of the term "waiver" here, although it recognizes that some writers distinguish those two concepts as "waiver by statute" and "waiver by conduct."

*Reata* did not change the rule that a waiver of sovereign immunity arises only from a clear and unambiguous legislative or constitutional provision. *See Wichita Falls State Hosp.*, 106 S.W.3d at 695; Tex. Gov't Code § 311.034 ("In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language"). And defendants do not identify any statutory or constitutional provision waiving sovereign immunity and allowing their

claims against the State. There is none. The only provision of the TMFPA that addresses sovereign immunity refers to a specific and limited waiver for a claim that is not and could not be brought here. In the TMFPA subchapter authorizing private plaintiffs to bring *qui tam* actions in the State's name, the Legislature provided that the State's choice to proceed with such a *qui tam* action makes the State subject to the pre-existing statute authorizing attorney's fees for a frivolous claim by a state agency. Tex. Hum. Res. Code § 36.112 (citing chapter 105 of the Texas Civil Practice and Remedies Code). This case is not a *qui tam* action, of course, nor do defendants assert a chapter 105 claim.

That single type of claim in a *qui tam* action is the only claim against the State contemplated by the TMFPA. No other TMFPA subchapter contemplates a claim against the State at all. And the Legislature made clear that the TMFPA's *qui tam* subchapter waives sovereign immunity only as provided in section 36.112. *Id.* § 36.116 ("Except as provided by Section 36.112, this subchapter does not waive sovereign immunity."). That explicit cabining of this sole waiver of sovereign immunity confirms the Legislature's interest in controlling the public fisc through appropriations. *See* Tex. Gov't Code § 311.034 (stating policy behind clear-statement rule). Because no constitutional provision or legislative enactment expresses consent to suit against the State when it brings a TMFPA action, there is no waiver of sovereign immunity.

## B. No common-law exception to immunity applies.

Defendants assert a broad theory: that the State's initiation of an enforcement action "for monetary relief" means that the State has left the sphere of its sovereign immunity from suit and must face damages counterclaims. Appellants' Br. 9. That theory would have serious consequences, and no court has gone that far. The State does not leave its sphere of sovereign immunity when it acts within its sovereign powers to enforce laws protecting state programs. Defendants' reliance on *Reata* is misplaced because that case did not involve a government exercising its police power, but rather a government acting in its private capacity by suing in tort for property damage to a water pipeline. Moreover, *Reata* recognized only a limited class of claims outside the sphere of immunity when a government proceeds in its private capacity, and that class of claims would not include defendants' counterclaims here even if this case involved the same type of action as in *Reata*, which it does not.

### 1. Because the State acts within its sovereign powers in bringing this TMFPA enforcement action, it does not leave its sphere of sovereign immunity from suit.

**a.** Sovereign immunity is "an established principle of jurisprudence in all civilized nations," *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857), and it was specifically emphasized by the framers of the United States Constitution, *Wichita Falls State Hosp.*, 106 S.W.3d at 694–95. As Alexander Hamilton recognized in *The Federalist Papers*, "It is inherent in the nature

of sovereignty not to be amenable to the suit of an individual without its consent . . . [and], as one of the attributes of sovereignty, [that immunity] is now enjoyed by the government of every State in the Union." *The Federalist No. 81*, at 487 (Alexander Hamilton) (Clinton Rossiter ed. 1961) (dismissing fears that the new Constitution would abrogate States' sovereign immunity).

The Texas Supreme Court "ha[s] not absolutely foreclosed the possibility that the judiciary may abrogate immunity by modifying the common law," but it has been careful when asked to do so. *Wichita Falls State Hosp.*, 106 S.W.3d at 696; *see Reata*, 197 S.W.3d at 375 ("[w]e have generally deferred to the Legislature to waive immunity"). That care is based on two reinforcing principles. First, "the people's will [regarding sovereign immunity] is expressed in the Constitution and laws of the State," and courts should be reluctant to second-guess that popular will on policy grounds. *Wichita Falls State Hosp.*, 106 S.W.3d at 695. Second, as compared to the judicial branch, "the Legislature is better suited to balance the conflicting policy issues" presented by abrogating sovereign immunity. *Id.*

Applying those principles, the Supreme Court has declined to judicially abrogate a governmental entity's sovereign immunity even though the Legislature had waived another governmental entity's immunity for the same conduct. *Guillory v. Port of Houston Auth.*, 845 S.W.2d 812, 814 (Tex. 1993). Likewise, the Supreme Court has declined to judicially abrogate the State's sovereign immunity even though a statute provided in general terms that a

patient may sue a mental health facility for damages caused by statutory violations. *Wichita Falls State Hosp.*, 106 S.W.3d at 696, 698. That deferential approach is appropriate because it leaves decisions about the wisdom of exposing the State to suit in the hands of policymakers.

**b.** In *Bates v. Republic*, 2 Tex. 616 (1847), the Supreme Court recognized that when the government seeks to recoup public funds, counterclaims against it remain barred by sovereign immunity. There, the State sued a district court clerk (Bates) for wrongfully failing to turn over money to which the State was entitled based on the seizure of two ships but which Bates held in his possession because the money had been paid to him. *Id.* at 616–17. The clerk was ordered to show cause why he refused to pay over the money, and his answer was that the State was indebted to him for a greater amount of money. *Id.* at 617. Bates argued that, once the State "brings a party into court, the same rules obtain as between individuals." *Id.* at 617.

The Supreme Court rejected that argument and did not allow his claim against the State. *Id.* at 618. It explained that Bates' claimed set-off "is in the nature of a cross action . . . and therefore cannot be instituted or set up against the government without its consent." *Id.* The Court reasoned that the "high purposes of public policy" behind "the exemption of the government from suits at the instance of private individuals would be thwarted to a great extent" if courts allow claims against the government "by permitting the claimant *to retain public money*." *Id.* (emphasis added). The Court might have ruled narrowly by reasoning that Bates' claim was topically unrelated

to the State's claim. But it instead relied on the broader principle that the State's suit for funds to which *the public* is entitled does not place the State outside its sovereign function and thus its sovereign immunity.

Were the rule otherwise, inconsistencies would result when the State proceeds in its sovereign capacity by instituting law-enforcement actions. When the State seeks criminal penalties, defendants have no right to raise counterclaims, as if to reduce imprisonment or criminal fines by establishing a competing liability (e.g., an asserted liability for invasion of privacy in a government search). But when sued in a civil penalty proceeding for the same conduct, the illegitimate rule argued here would mean that defendants could seek to reduce their punishment and delay the action by counterclaiming for damages. *Bates* properly forecloses that result. Courts are rightly reluctant to create such an unwise policy, which the people of Texas have not approved through legislative enactment.

**c.** Defendants prominently cite two cases, *see* Appellants' Br. 8–9, but neither case supports their theory of sovereign immunity.

**1.** First, defendants cite *Anderson, Clayton & Co. v. State ex rel. Allred*, 62 S.W.2d 107, 110 (Tex. Comm'n App. 1933, judgm't adopted). Appellants' Br. 8. But *Anderson* is consistent with *Bates*; it looks at the *nature of the claim* to determine sovereign immunity.

*Anderson* dealt with a counterclaim seeking relief fundamentally different than the relief sought here: an injunction against state officers enforcing an allegedly invalid law. 62 S.W.2d at 110. The lawsuit in *Anderson* began

when the Attorney General brought an enforcement action to enjoin the defendants from "operating . . . trucks over the highways of Texas for transporting property for compensation or hire without obtaining permits from the State Railroad Commission." *Id.* at 107. Defendant Anderson, Clayton & Co. argued that the permitting law was invalid, and it sought by counterclaim an order restraining certain members of the Railroad Commission from "further arresting, prosecuting, and threatening to arrest" their drivers for violation of that law. *Id.* Hence, the counterclaim was to enjoin the enforcement of an allegedly invalid law. *Id.*

The Commission of Appeals explained that sovereign immunity does not apply to a claim of that nature: "the state's immunity from suit does not extend to a suit against state officers to enjoin the enforcement of an invalid law to the injury of the legal rights of a citizen." *Id.* at 110; *see generally City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009) ("[W]hile governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions."); *Ex parte Young*, 209 U.S. 123, 154 (1908) (allowing federal courts to award prospective relief against state officials for violations of federal law).

In other words, the state officers never had sovereign immunity from such a claim, regardless of how it was asserted. The question before the Commission on Appeals was thus about the venue in which the claim for

injunctive relief could be brought. The question certified to the Commission asked: "Did the *District Court of Nueces County* acquire jurisdiction over the defendants named in the cross bill [i.e., over the state officials]?" 62 S.W.2d at 109 (emphasis added). If jurisdiction over a specific state officer as opposed to the State is conceived of as a further hurdle imposed by sovereign immunity, then *Anderson* would stand for the proposition that this aspect of immunity is "waived" when the State brings an enforcement suit and then "answer[s] [a counterclaim seeking to enjoin officers] in a court of competent jurisdiction." *Id.* at 110. That appears to be how the Supreme Court views *Anderson*. *See Reata*, 197 S.W.3d at 377. But the important point is that this rule applies to create jurisdiction in a given court where there is *some* basis for finding that the claim can be brought against the State. In *Anderson*, that basis was the nature of the claim: prospective relief to enjoin alleged ultra vires actions. That is not the nature of the counterclaims here. And no other case makes defendants' claims exempt from sovereign immunity.

**2.** Defendants argue that *Reata* supplies that exemption—that it abrogates the State's sovereign immunity when and to the extent that the State files any action that seeks any "monetary relief." Appellants' Br. 9. That is incorrect. The government in *Reata* decided "to leave its sphere of immunity" by filing a suit that any ordinary litigant could file: a "suit for damages" resulting from negligence during construction work. 197 S.W.3d at 377.

In contrast, when the State exercises its sovereign powers to bring a law enforcement action, it is not seeking "damages" and it retains its sovereign

immunity from claims against it. *E.g.*, *Bates*, 2 Tex. at 618 (holding the State immune from counterclaims where it sued, not for "damages," but to collect public money wrongfully withheld); *see Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013) ("In a civil penalty action, the Government is not only a different kind of plaintiff, it seeks a different kind of relief."); *SEC v. City of Miami*, 581 F. App'x 757, 760 (11th Cir. 2014) (rejecting the argument that a suit for "any type of monetary award" is a suit for "damages" entitling a state official to qualified immunity: "The SEC does not seek damages from Boudreaux in a private suit; rather this is a government enforcement action that seeks civil monetary penalties against the defendants"); *State v. Emeritus Corp.*, No. 13-13-00529-CV, 2015 WL 1456436, at *10–11 (Tex. App.—Corpus Christi Mar. 26, 2015, pet. filed) (holding that the State's enforcement action under the Deceptive Trade Practices Act does not seek "damages" within the meaning of a tort-reform statute). Because this suit is of the latter type, it is not within the exception recognized in *Reata*.

The facts of *Reata* are illustrative of the sort of claim to which its reasoning applies. There, the City had contracted with a construction company to install fiber optic cable in Dallas. 197 S.W.3d at 373. The contractor hired a subcontractor, who inadvertently drilled into a water main, which in turn flooded a building. *Id.* The building's owner sued the contractor and subcontractor, seeking damages for negligence. *Id.* The subcontractor filed a third-party claim against the City, alleging it was negligent in identifying the water main. *Id.* The City intervened, asserted negligence claims against the

contractor, and answered the subcontractor's third-party claim while seeking its dismissal based on sovereign immunity. *Id.* The Supreme Court held that by intervening in the case and asserting a claim for monetary damages related to the property, the City left its sphere of immunity and was subject to Reata's claims that are "germane to, connected with, and properly defensive to the City's claims, to the extent Reata's claims offset those asserted by the City." *Id*.

Unlike the case here, *Reata* did not involve a government exercising its sovereign powers to enforce a public-welfare statute. Rather, the City was acting as any ordinary litigant could, in its private capacity, seeking to recover damages for a tort. *Id.* at 373–77. That featured in the Court's reasoning, which rested on the idea that, once the government acts as a normal litigant by "fil[ing] suit for damages," "it must participate in the litigation process as an ordinary litigant." *Reata*, 197 S.W.3d at 377.

The Court's reasoning is based on that idea of parity; hence, its reasoning does not apply when there is no parity because the State acts in its sovereign capacity rather than its private capacity. *See Little-Tex*, 39 S.W.3d at 599 (making similar distinction in the contract context: "Texas courts have long recognized that the State wears two hats: the State as a party to the contract and the State as sovereign."). The Court in *Reata* did not have before it any law-enforcement action, in which the State proceeds under its police powers. Hence, the Court's opinion embraces only the sort of "monetary recovery" lawsuit before it—one in which "the governmental entity

interjects itself into or chooses to engage in litigation to assert affirmative claims for *monetary damages*." *Reata*, 197 S.W.3d at 375 (emphasis added).

Nor would the Court's reasoning regarding those private actions extend to sovereign law-enforcement actions. *Reata* relied on its parity reasoning, notwithstanding the Court's strong deference to the Legislature in defining the extent of sovereign immunity, because the Court perceived no room for reasonable policy debate about immunity from the limited class of counter-claims at issue there: those integral with, properly defensive to, and not exceeding offset of, the government's damages claim. *Id.* at 376–77. The Court explained that it could not see any issue with "hampering of its governmental functions," *id.* at 376-77, and that the State's inability to recover on "affirmative claims for monetary damages" (due to an offset otherwise not payable) should not affect "the fiscal planning of the governmental entity," *id.* at 375.

But the issues on which the Court perceived no significant debate in the context of a private tort lawsuit present greatly heightened concern in the context of a sovereign's law-enforcement suits. This case is squarely within mold of those in which courts defer to the Legislature to make the policy-based balancing underlying sovereign immunity's scope. *See, e.g.*, *Wichita Falls State Hosp.*, 106 S.W.3d at 695 ("Courts in other jurisdictions have occasionally abrogated sovereign immunity by judicial decree. We have held, however, that the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity.") (footnote omitted); *City of*

*Galveston v. State*, 217 S.W.3d 466, 473 (Tex. 2007) ("Judges cannot simply abrogate immunity every time they believe the Legislature's failure to do so 'defies logic.'").

The heightened concerns arise because law-enforcement actions under a government's police power seek to protect the public welfare, meaning that impediments to suit can delay or derail vindication of public safety and vital state programs. *See State v. City of Greenville*, 726 S.W.2d 162, 169 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (observing that a public-welfare statute is one intended to "safeguard the public health, welfare, and physical property of the people" (citation omitted)). Expanding the *Reata* rule to that context would empower wrongdoers who target state programs by giving them a tool to impede the State's law-enforcement action through cross-litigation that should instead be resolved (or barred) through another statute (such as the Tort Claims Act).

Indeed, the Supreme Court has recognized the mechanism underlying that concern, noting that a conduct-based exception to immunity would "force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies." *IT-Davy*, 74 S.W.3d at 857. That defeat could affect the public interest in compliance with a host of important state programs, from compliance with child-support laws, to restitution recovery in Deceptive Trade Practices Act actions, to deterrence of Medicaid fraud. When considering actions in the entity's sovereign capacity

to enforce obligations under state programs, courts understand that the Legislature is better situated to perform the policy-based balancing of interests. The Legislature's knowledge about fiscal appropriations and the state programs gives it the best vantage point to balance the interest in orderly enforcement proceedings with the effects of enlisting those judicial actions themselves, as opposed to other processes, to address interests and claims asserted by defendants.

Moreover, offset claims obstructing a sovereign's law-enforcement actions could indeed affect "the fiscal planning of the governmental entity." *Cf. Reata*, 197 S.W.3d at 375. Whereas a private claim for damages merely restores the governmental entity to the position in which it would have been but for a tort, governmental enforcement actions arise in a more complicated environment. They serve a deterrent function and thus help ensure that future violations do not occur. Second, the money they recover is often pursuant to a systematic effort of fraud control and collection of money belonging in the public fisc; they are not simply one-off actions resulting in unexpected recoveries. By the same token, when a governmental entity does not budget for any liability on possible claims against it but then has those claims affect an ongoing stream of enforcement actions that it has budgeted for, that liability on the counterclaims very much affects governmental budgeting and hampers its operations. The Court need not balance those policy concerns them here. The point is that those concerns were not present or noted in the private-action context of *Reata* but present significant concerns

in the sovereign-action context here. Those concerns confirm that why abrogation of sovereign immunity is left to the traditional avenue of legislative action.

*Reata* does not negate any of those principles. Indeed, the Court noted that "the Legislature is better suited to address the conflicting policy issues involved" in the application of sovereign immunity. 197 S.W.3d at 375. The Court recognized the limited exception to sovereign immunity only because it could see no conflicting policy views in the context before it. *See id.* at 375–77. Those conflicting interests exist in the context here, as explained.

And there is no need to guess about the Legislature's policy views regarding sovereign immunity in a TMFPA action. Whereas *Reata* involved a common-law tort (negligence), the TMFPA speaks to sovereign immunity and makes clear that the only exclusion the Legislature has determined is appropriate in a TMFPA action is for a claim against the State for certain litigation expenses if the State proceeds with a frivolous *qui tam* action initiated by a private plaintiff. *See* Tex. Hum. Res. Code §§ 36.112, 36.116 (referencing state liability under chapter 105 of the Civil Practice and Remedies Code).

**3.** Just as *Anderson* and *Reata* do not support defendants' claimed exemption from sovereign immunity in this enforcement action, neither do the rest of the cases on which they rely.

Defendants first cite *State v. Zanco's Heirs*, 18 Tex. Civ. App. 127, 129, 44 S.W. 527, 529 (1898, writ ref'd), for the principle that "[w]hen the state

of Texas enters its courts as a litigant, it must be held subject to the same rules that govern other litigants." Appellants' Br. 8. But the principle that the State "'must have its rights determined by the same principles applicable to other litigants'" is an "unremarkable proposition" that "has nothing to do with immunity from suit." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 406–07 (Tex. 1997) ("To state what happens *if* the State consents to be sued says nothing about whether the State consents to be sued.").

And the cases that apply the *Reata* exception all comport with the analysis above: they allow a counterclaim when the governmental entity is asserting claims in its private capacity but not when it exercises its police powers to bring an enforcement action. *Compare Albert*, 354 S.W.3d at 370–71, 374 (applying *Reata* to allow claims against a governmental entity that asserted breach of contract), *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 510–11, 527 (Tex. App—Austin 2014, no pet.) (same), *City of San Antonio v. KGME, Inc.*, 340 S.W.3d 870, 873, 877–78 (Tex. App.—San Antonio 2011, no pet.) (same), *Sweeny Cmty. Hosp. v. Mendez*, 226 S.W.3d 584, 586, 594 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (same), *Harris Cnty. v. Luna-Prudencio*, 294 S.W.3d 690, 698 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (applying *Reata* exception to allow claims against a governmental entity that asserted a tort claim), *and City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 378, 383 (Tex. App.—Dallas 2004, no pet.) (applying *Reata* exception to allow claims against a governmental entity that asserted breach of lease), *with Waller County v. Simmons*, No. 01-07-00180-

CV, 2007 WL 3038420, at *3 (Tex. App.—Houston [1st Dist.] Oct. 18, 2007, no pet.) (mem. op.) (explaining that although the governmental entity was seeking monetary relief, the *Reata* exception did not apply because "a suit to recover delinquent taxes is, by its very nature, not a claim for monetary damages, but rather a foreclosure of a lien"). In short, those cases do not allow counterclaims when the government is proceeding in its sovereign capacity.

And that is the nature of a TMFPA action: it is not a private claim for "damages" but rather a law-enforcement action under a public-welfare statute that serves to deter and punish violations of laws and regulations governing the Texas Medicaid program. An action under the TMFPA may be brought only by the State or a *qui tam* relator authorized to proceed in the State's shoes (subject to the State's control). *See supra* p. 68 & n.1. The fact that a private plaintiff must step into the State's shoes to sue (through the *qui tam* mechanism) signals that this is not a case in which the State proceeds as an ordinary litigant. The TMFPA is designed precisely to provide the State with new ways to deter and punish violations of the Medicaid program requirements.

Moreover, the statutory remedies under the TMFPA are not "damages" within the meaning of *Reata*. The TMFPA makes each person who commits an unlawful act liable to the State for three times the amount of *any* benefit or payment provided by Medicaid as a *direct or indirect* result of the unlawful act. Tex. Hum. Res. Code § 36.052(a) ("Civil Remedies"). That

amount does not turn on actual loss to the State; rather, the statute uses the amount of any payment or benefit linked directly or indirectly to the unlawful act as a measure of the severity of the violation for purposes of tailoring the assessment owed for that violation. *See* CR.96 (explaining that the TMFPA reflects criminal-law principles); *cf., e.g.*, U.S. Sentencing Guidelines § 2B4.1 (adjusting the recommended punishment level based on the amount of the improper benefit "to be conferred" in a kickback scheme, whether or not any actual loss was caused). Hence, the TMFPA rightly does not refer to its statutory remedies as "damages." Tex. Hum. Res. Code § 36.052(a); *see, e.g.*, *Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) (distinguishing "damages" from restitution of proceeds and fines and assessments payable to the government).

The TMFPA further imposes a civil penalty of between $5,500 and $15,000 for each statutory violation. Tex. Hum. Res. Code § 36.052(a). That is an additional penalty, on top of the assessment of three times the amount of any payment or benefit linked to the unlawful act. *Id.*

In short, defendants' simplistic labeling of this enforcement action as "a simple tort" suit, Appellants' Br. 24, ignores critical defining characteristics of the TMFPA. That argument fails to grapple with the important distinctions of such an enforcement action from the private-capacity "damages" suit addressed in *Reata*. The Supreme Court in *Reata* did not address sovereign law-enforcement actions, and *Reata* in fact notes the special legislative

role in balancing complex policy interests that inform the application of sovereign immunity. The State's initiation of a TMFPA law-enforcement action does not expose the State to counterclaims to which it is otherwise immune, any more than the State's initiation of a judicial proceeding seeking fines as criminal punishment brings the State outside of its sphere of sovereign immunity from claims against it.

### 2. Additionally, defendants' counterclaims fall outside the class of counterclaims covered by the *Reata* exclusion from sovereign immunity.

Even if this TMFPA enforcement action did generally allow some counterclaims within the class described in *Reata* (and it does not), defendants' counterclaims would not fall within that class. The district court's dismissal of their counterclaims may be affirmed for that reason as well.

*Reata* allowed only counterclaims if they are "germane to, connected with[,] and properly defensive to" the asserted claims. 197 S.W.3d at 377. For example, *Reata* explained that a defendant in a tax suit could not counterclaim for an offset resulting from its prior overpayment of taxes: that claim "was not connected with the State's claim as the two involved taxes for different months and years." *Id.* at 376. As that example illustrates, "germane" and "connected" counterclaims require at a minimum that the operative facts are the same for the claim and counterclaim.[3] The counterclaim

---

[3] Indeed, were that connection not so tight as to require the same transaction in dispute, this exemption to sovereign immunity would present concerns of equity and limited funds by giving some citizens priority to receive credit for their claims against the public fisc; those sued by the State would strangely possess a comparative advantage over

cannot assert rights arising from conduct different from the conduct that the plaintiff asserts creates the defendant's liability. Similarly, a "properly defensive" counterclaim must be one that "would at least inferentially rebut" the governmental entity's claim. *Albert*, 354 S.W.3d at 375 (where a government alleged that officers were overpaid, holding a counterclaim "properly defensive" where the officers alleged they were underpaid).

Defendants' counterclaims do not meet those criteria. This action alleges that defendants knowingly made misleading statements and omissions in submitting Medicaid requests. CR.120–28. That is a violation of the TMFPA. The statute does not require the State to prove anything about how the fraud could or could not have been detected. That makes sense given that the size of the Medicaid program and the role of providers within it has led to the State imposing a duty on enrolled providers directly to learn and honestly abide by Medicaid rules and regulations.

In contrast, defendants want to turn this case into a dispute about fraud detection, rather than whether they knowingly made false statements. Defendants thus seek to inject collateral issues into this suit by asserting counterclaims that revolve around: (1) the approval of defendants' requests for

---

other citizens who must have their liabilities satisfied through the normal presentment process. Hence, to reflect that reality and respect the interests of third parties, bankruptcy practice also draws narrowly the term "transaction" for purposes of equitable recoupment. *E.g.*, *In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998); *In re Univ. Med. Ctr.*, 973 F.2d 1076, 1081 (3d Cir. 1992) (observing that "the open-ended standard, endorsed in the context of discerning compulsory counterclaims, is inadequate for determining whether two claims arise from the same transaction for the purposes of equitable recoupment in bankruptcy"); *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984) (holding that the counterclaim must be so closely related that it "is essentially a defense").

prior authorization and defendants' reliance on the approval of their requests, (2) an allegedly improper review process implemented by the State's contractor and the State's failure to detect the impropriety for some time, and (3) the Medicaid program withholding some funds pursuant to a payment hold. Appellants' Br. 9–11.

None of those issues are "connected with" or "properly defensive to" the State's TMFPA case. Rather, they are like the counterclaims in *Reata*'s tax-suit example; they may involve the same government and the same regulatory scheme, but they involve different aspects of the defendant's interaction with that scheme than have been put into dispute by the plaintiff's claims. Likewise, defendants' counterclaims here do not pass *Albert*'s test of "at least inferentially rebut[ting]" the State's claims, 354 S.W.3d at 375, in the same way that a counterclaim for underpayment inferentially rebuts a claim for overpayment.

Put simply, it is not an element of the State's case against the dental groups whether their false statements were detected by the State, should have resulted in rejection of their requests, or led to any sort of payment hold. The State need only prove that defendants knowingly made prohibited statements to the Medicaid program. *See* CR.120–28. Defendants' counterclaims are not germane to, connected with, and properly defensive to the claim that they did so. Accordingly, even assuming *Reata*'s conduct-based exclusion from sovereign immunity applies here, the filing of this action

would not be deemed to invite judicial resolution of the counterclaims as properly defensive and connected to the sovereign's suit.

Defendants gain no ground by citing *City of New Braunfels v. Carowest*. Appellants' Br. 11. There, the City was sued for breach of contract and then counterclaimed for breach. 432 S.W.3d at 525. Carowest's breach claims against the City were held within the class allowed by *Reata* because those claims "implicate[d] the same core operative facts underlying the City's monetary claim—namely, whether the City and Carowest complied with their respective obligations." *Id.* at 526. Here, defendants wish to bring into this case the issue of Xerox's own separate actions in approving prior-authorization requests and representing to the State the nature of its claims-administration work. But that ventures far outside the "core operative facts" underlying the State's claim. Xerox's own misdeeds and misrepresentations to the State do not excuse defendants' knowing false statements to the State.

Defendants cite no case in which such a claim was deemed to pose the necessary close connection. *Cf. Albert*, 354 S.W.3d at 375 (explaining that the officers' claims were germane and connected to the City's because "they were both based on the question of pay for the Officers' employment"). Nor are those counterclaims "properly defensive" given that they could not "rebut an essential element" of the State's case. *Cf. id.*; *Dillard v. Tex. Elec. Co-op*, 157 S.W.3d 429, 430 (Tex. 2005). Even if defendants' counterclaims could show that they believed the services they described on

the requests for prior authorization were covered by Medicaid, *see* Appellants' Br. 14, that is not defensive to the State's claims. The point of the State's claims is that the providers made false statements in describing those services and the medical necessity for them. And a TMFPA violation does not require anything more, such as a specific intent to defraud Medicaid. Tex. Hum. Res. Code § 36.0011(b).

Of course, if defendants wish to argue that they did not make misstatements (*see* Appellants' Br. 15), they do not need counterclaims to negate an element of the State's case with their own proof. Likewise, if defendants wish to argue that they were not even consciously indifferent to the truth of the statements they made, *see* Tex. Hum. Res. Code § 36.0011(a), that option is available to them by way of simply defending against the State's charges. Defendants can always introduce proof they believe will defeat the State's allegations and thus negate liability. Defendants' counterclaims, however, are designed to assert some *liability* on behalf of the State based on its conduct in reviewing defendants' statements, which is not any part of the alleged violation in this statutory proceeding.

**3. Even were it relevant, federal precedent would also bar defendants' counterclaims against the State in a False Claims Act suit.**

The sovereign-immunity analysis here proceeds under Texas law about the State's immunity from suit in its own courts, which here involves the nature of the claims brought under the Texas Medicaid Fraud Prevention Act. Nonetheless, defendants suggest a comparison to federal law about the

State's immunity from claims in federal court when bringing a False Claims Act suit. Appellants' Br. 17–23. Even assuming the relevance of federal law, it would not support defendants' ability to sue the State here.

A False Claims Act defendant's claims for indemnification or contribution are not permitted, while claims for damages independent of False Claims Act liability may be permitted so long as they "do not have the effect of providing for indemnification or contribution." *United States v. Campbell*, No. 08-cv-1951, 2011 WL 43013, at *11 (D.N.J. Jan. 4, 2011) (quotation marks omitted). For example, a *qui tam* defendant can assert misappropriation of trade secrets against an employee who becomes a *qui tam* plaintiff, provided the claim does not depend on the defendant's False Claims Act liability. *See United States ex rel. Madden v. Gen. Dynamics Corp.*, 4 F.3d 827, 829, 831 (9th Cir. 1993). The court in *Campbell* explained that this classification requires looking past whether claims are "worded to include allegations of fraud and misrepresentation," but instead to look at the claims' substance and "basis for damages." 2011 WL 43013, at *11–12.

Defendants' argument, however, is simply that someone could imagine writing a jury question asking if the State defrauded defendants or breached duties to them. Appellants' Br. 22-23. But any counterclaim could be stated on a jury form. The question is not whether a claim could be stated using the word "fraud" or "breach"—that simply looks at the form of the pleading,

contrary to *Campbell*. Rather, what matters is the basis for the damages asserted in the counterclaim: whether those damages are independent of the defendant's liability False Claims Act.

The counterclaims here are not independent. If defendants are not liable for making false statements to Texas Medicaid, then this enforcement action does not deprive them of money and thus "injure" them. As in *Campbell*, the counterclaims here in effect seek indemnification for defendants' liability and are thus be impermissible. 2011 WL 43013, at *12.

## C. The counterclaims are in the nature of an estoppel affirmative defense that does not apply here.

Defendants' counterclaims articulate concepts that sound in estoppel—specifically, that the State cannot prevail because the State allegedly conspired with Xerox or violated its contract with Xerox, as to encourage the dental groups to continue submitting the misleading statements for which they are now sued. Even if defendants had answered with an affirmative defense of estoppel as opposed to bringing counterclaims, that estoppel defense would not apply here, as they argue. *Cf.* Appellants' Br. 25–26.

For example, in defendants' cited case *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 773 (Tex. 2006), the Supreme Court restated its longstanding rule that cities generally may not be estopped from exercising government functions, although a city may be estopped when acting in a proprietary capacity. The Court explained that estoppel is available against a city only "where justice requires . . . application [of the doctrine] and there

is no interference with the exercise of governmental functions." *Id.* at 774. The Court cautioned that estoppel is "available 'only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice.'" *Id.* (citing *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970)); *accord Heckler*, 467 U.S. at 60 ("When the Government is unable to enforce the law . . . the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.").

The Supreme Court then applied both elements to the facts at hand, finding that the city had not benefitted from its failure to enforce an ordinance previously and that applying estoppel would interfere with the City's enforcement of the ordinance and thus impede a governmental function. *Super Wash*, 198 S.W.3d at 776–78. Hence, neither element justified the rare recourse to estoppel against the government. *See also Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 170–71 (Tex. 2013) (declining to apply the doctrine, and noting that "[t]his case stands in stark contrast to two cases where we have held the government estopped—cases where the government stalled private citizens from providing proper notice of claims until after the notice deadline passed").

That analysis confirms that defendants' arguments about allegedly being induced into continuing with their fraud are arguments for an estoppel

defense. They are not arguments for a counterclaim seeking to hold the State liable for damages. Those are different concepts.

Of course, even if defendants were to plead it as an affirmative defense, estoppel would not be available as an affirmative defense in this TMFPA enforcement action, for the reasons just explained. There can be no coherent suggestion that the State deliberately induced the dental groups to submit false requests for prior authorization and false reimbursement claims to Medicaid, much less that the State somehow benefitted from the dental groups' unlawful conduct doing so or Xerox's approval of the prior-authorization requests. And recognizing an estoppel defense when the State's claims administrator fails in its independent duty to timely catch and reject fraud would greatly interfere with the State's governmental function of enforce the TMFPA. Such a result would essentially reshape the State's multi-front approach to Medicaid fraud control, in which the State seeks to detect fraud but in which providers themselves have a duty to know and abide by Medicaid rules and regulations as a condition of participation and payment. *See Heckler*, 467 U.S. at 64 ("As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement.").

Imagine a store clerk who fails in his obligation to keep watch over a store, instead listening to headphones and playing video games. A patron may seize the moment to take items without paying. If the shoplifter is being disciplined, it is no excuse that he waved at the inattentive clerk, and the

clerk did not see any wrongdoing and waved him out of the store. The store owner gains nothing by his employee's failure to perform his monitoring function, and there can be no plausible basis for finding estoppel if the owner sues the shoplifter. The employee's own dereliction of duty is a second problem, not an excuse for the shoplifter's wrongdoing.

Defendants have cited no case in which a Texas court applied the doctrine of equitable estoppel against the State in an action in which the State proceeds in its sovereign capacity to enforce a public-welfare statute, such as the TMFPA. *Cf., e.g.*, *In re S.A.P.*, 156 S.W.3d 574, 577 (Tex. 2005) (per curiam) (equitable estoppel generally does not apply to a sovereign); *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993) (same). Instead, the cases cited by defendants all involve a finding that (1) manifest injustice demanded application of the doctrine in light of misconduct by city officials and (2) no government function would be impaired. *See* Appellants' Br. 26–27.

In short, the affirmative defense of estoppel is available in appropriate cases even if the defendant is barred by sovereign immunity from asserting a claim that the government is liable to him for the alleged wrongful conduct. Such a defense would be unavailable on the facts here, but that is no excuse to attempt to slip in such a defense through the mechanism of a counter-claim. The State does not invite judicial resolution of such claims against it when bringing a law-enforcement action in its sovereign capacity and, even if it did, defendants' counterclaims would not be within the limited class of

germane, connected, and properly defensive counterclaims that could be asserted in this action by way of offset.

## II. This Court Lacks Jurisdiction over Defendants' Interlocutory Appeal from the Dismissal of Their Third-Party Claims Against Xerox.

The order from which defendants appeal dismisses their counterclaims on the State's plea to the jurisdiction and dismisses their third-party claims on the state's motion to dismiss. CR.384. That is an interlocutory order because it does not dispose of all pending claims and parties. As an interlocutory order, it is generally not appealable absent statutory authorization. A statute does authorize the appeal from an order granting the State's plea to the jurisdiction, Tex. Civ. Prac. & Rem. Code § 51.014(a)(8), but no statute authorizes the appeal from the order dismissing the third-party claims against Xerox on non-jurisdictional grounds. Accordingly, this Court lacks appellate jurisdiction to hear that aspect of the appeal.

**A.** When an order does not "indicate[] that it is a final judgment, and [does] not dispose of *all* pending claims and parties," it is not "a final and appealable judgment." *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001) (emphasis added); *see also Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex. 1992) ("A final judgment is one which disposes of *all* legal issues between all parties." (emphasis added)). Generally, only final orders, not interlocutory orders, are appealable. *Bally Total Fitness Corp. v.*

*Jackson*, 53 S.W.3d 352, 352 (Tex. 2001) ("A party may not appeal an interlocutory order unless authorized by statute."); *accord Henderson v. Shell Oil Co.*, 182 S.W.2d 994, 995 (Tex. 1944).

If a statute does not specifically provide an exception to that general rule, then "[a]n appellate court lacks jurisdiction to review an interlocutory order." *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 336 (Tex. 2000) (per curiam); *see also Stary v. DeBord*, 967 S.W.2d 352, 352–53 (Tex. 1998) ("Appellate courts have jurisdiction to consider immediate appeals of interlocutory orders only if a statute explicitly provides appellate jurisdiction.") (per curiam). Even if portions of an interlocutory order are made appealable by statute, those appealable portions do not give the appellate court jurisdiction over the entire order. *See Dickson v. Dickson*, 516 S.W.2d 28, 30 (Tex. Civ. App.—Austin 1974, no writ) ("Further, the fact that an interlocutory order contains elements which are, under the law, appealable, does not authorize review of elements of the order which are not made specifically appealable."). In those situations, "the proper course is to dismiss that portion which is non-appealable, and to rule on the portion from which an appeal may be taken." *Bobbitt v. Cantu*, 992 S.W.2d 709, 712 (Tex. App.—Austin 1999, no pet.).

**B.** Defendants' appeal of the order dismissing their third-party claims against Xerox is an impermissible interlocutory appeal that must be dismissed. That order is interlocutory because it only disposed of only some

claims and one party. *See* CR.383–84. The State and defendants remain parties to the action and the State's claims against defendants remain pending, meaning that the order is not a final judgment. *See Lehmann*, 39 S.W.3d at 206; *Jack B. Anglin Co.*, 842 S.W.2d at 272.

Accordingly, that interlocutory order is not appealable unless permitted by statute, and no statute exists. Defendants' statement of jurisdiction (Appellants' Br. xi) cites Civil Practice and Remedies Code § 51.014(a)(8). But that provision only confers authority to appeal only from the order granting the State's plea to the jurisdiction, not the State's motion to dismiss the third-party claims as barred on non-jurisdictional grounds. *Id.* (authorizing interlocutory appeal from an order that "grants or denies a plea to the jurisdiction by a governmental unit"). And this Court has jurisdiction only over the aspects of the district court's order that are explicitly made appealable by statute; it does not gain jurisdiction over the entirety of an order with one appealable component. *Dickson*, 516 S.W.2d at 30 ("Further, the fact that an interlocutory order contains elements which are, under the law, appealable, does not authorize review of elements of the order which are not made specifically appealable."); *Bobbitt*, 992 S.W.2d at 711–13 (where, "in the same order," the district court partially granted summary judgment and temporarily enjoined certain conduct, dismissing appeal as to the summary judgment because "the district court's grant of partial summary judgment

is non-appealable, although it comes along with the interlocutory order of temporary injunction" (quotation marks omitted)).[4]

Therefore, the Court should dismiss for lack of appellate jurisdiction defendants' appeal of the dismissal of their third-party claims against Xerox. *Dickson*, 516 S.W.2d at 30 ("Consequently, we dismiss this portion of the appeal as not being properly before this Court."). The Court has appellate jurisdiction only to rule on defendants' appeal from the order granting the State's plea. *Id.*

# PRAYER

The Court should affirm the portion of the district court's order granting the plea to the jurisdiction and thus dismissing the counterclaims against the State. The Court should dismiss the remainder of the appeal for lack of appellate jurisdiction.

---

[4] Even if the dismissal of defendants' third-party claims could be before this Court for review on the merits, the claims were properly stricken under Texas Rule of Civil Procedure 38(a) because the TMFPA does not authorize a defendant to bring a third-party claim; that fact also makes the third-party claims baseless under Texas Rule of Civil Procedure 91a. *See* CR.70–74, 92–108; Tex. Hum. Res. Code § 36.052(a) (making civil remedies recoverable from any violator, and defining a violator's liability to include the amount of any payment to a third party) *cf. Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex. App.—Texarkana 2000, no pet.) (holding that, because a DTPA action is specified by statute, only statutory defenses and not common-law defenses apply); *Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W.3d 290, 296-99 (Tex. App.—Dallas 2013, no pet.) (holding that the fault-allocation scheme in chapter 33 of the Civil Practice and Remedies Code does not apply to the Uniform Fraudulent Transfers Act because it conflicts with that Act's liability scheme).

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

RAYMOND C. WINTER
Chief, Civil Medicaid Fraud

REYNOLDS B. BRISSENDEN
Assistant Attorney General

SCOTT A. KELLER
Solicitor General

/s/ J. Campbell Barker
J. CAMPBELL BARKER
Deputy Solicitor General
State Bar No. 24049125
cam.barker@texasattorneygeneral.gov

PHILIP A. LIONBERGER
Assistant Solicitor General
State Bar No. 12394380

AUTUMN HAMIT PATTERSON
Assistant Attorney General
State Bar No. 24092947

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas

# CERTIFICATE OF SERVICE

On August 10, 2015, this document was served by mail or electronic means on:

**Counsel for Defendants–Appellants:**

Jason Ray
Riggs & Ray, P.C.
700 Lavaca St., Suite 920
Austin, Texas 78701

E. Hart Green
Mitchell A. Toups
Weller, Green, Toups & Terrell, L.L.P.
P.O. Box 350
Beaumont, Texas 77704-0350

**Counsel for Third-Party Defendants–Appellees:**

Constance H. Pfeiffer
Beck Redden LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010

Robert C. Walters
Gibson, Dunn & Crutcher LLP
2100 McKinney Ave., Suite 1100
Dallas, Texas 75201

Eric J.R. Nichols
Christopher R. Cowan
Beck Redden LLP
515 Congress Ave., Suite 1750
Austin, Texas 78701

/s/ J. Campbell Barker
J. CAMPBELL BARKER

# CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), Microsoft Word reports that this brief contains 11,792 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

/s/ J. Campbell Barker
J. CAMPBELL BARKER